27

1    today.

2         MR. BURANDT:  Let's take a minute.  Let's go

3    out here.

4         MR. ALLEY:  There is a question pending.

5         MS. STEVINS:  Yeah, I know.

6         (Recess taken from 9:40 to  9:42 a.m.)

7         MS. STEVINS:  Since both of these gentlemen are

8    back in the room, I think there is a huge difference

9    between reviewing a document and actually relying

10   upon a document for the compilation of his report.

11        MR. ALLEY:  There is opinion question.  Is

12   there an objection?

13        MS. STEVINS:  Yeah, my objection is that you're

14   asking him to produce things -- your Exhibit A says:

15   "Any and all documents relied upon for the

16   compilation of your report."

17        Now, there's a big difference between something

18   being relied upon by Mr. Tucker to formulate his

19   opinion and anything that he's reviewed.  He may

20   have reviewed something and not relied upon it.

21   That is my objection.

22        My objection is you're seeking information that

23   he's reviewed and not necessarily relied upon.  You

24   are entitled to ask anything that you want.  But I'm

25   telling you that those items that were provided to

28

1    him last night contain my attorney notes on the case

2    and that is work product information and I'm not

3    going to give you those.  You are not going to have

4    them as an attachment.  You know the depositions

5    exist.  They have been listed into the record.  They

6    are of equal access to you.  You can order copies

7    yourself.  You are not getting my notes contained in

8    these.  It's that simple.  If you want to compel me,

9    go right ahead.

10         MR. BURANDT:  This is Bob Burandt for the

11   record.

12         Are you willing to leave the notes with the

13   court reporter -- transcripts with the court

14   reporter pending court order?

15         MS. STEVINS:  At this point, I'm going to say

16   no.  I'd rather have the Court compel me to produce

17   them.

18         MR. BURANDT:  I'm not going to argue with you.

19   We're going to ask the Court not to make you compel.

20   We're going to ask the Court to strike him as a

21   witness.

22         MS. STEVINS:  That's ridiculous.

23         MR. BURANDT:  I'm just putting it on record.

24         MS. STEVINS:  It's your prerogative.  All I'm

25   saying --

29

1      MR. BURANDT:  We've discussed it and I'll put

2    in the motion, we have discussed it with you and

3    your response was "that was ridiculous," so let's

4    move on.

5      MS. STEVINS:  No, I'm going to finish my

6    statement.

7      MR. BURANDT:  You will have plenty of time to

8    respond to the motion.

9      MS. STEVINS:  My statement is that these are

10    depositions.  They are equally accessible to you,

11    that you can order them, that you can obtain copies.

12    You have them listed.  You know what they were,

13    because you were present with them.  You need to ask

14    him if he's relied upon them.  I'm not turning over

15    my attorney-client privileged notes.  I'm just not

16    going to do it.

17      MR. BURANDT:  I think once you've given them to

18    the expert, you have waived that privilege.

19      MS. STEVINS:  I'm not going to do it.

20      MR. BURANDT:  We'll ask Judge Steele and get

21    his opinion.

22      Let's move on.  This has taken way too much

23    time.

24  BY MR. ALLEY:

25      Q.   If you determine that there are -- is this

30

1   stack complete now?  These are all the documents -- in

2   addition to the seven documents that Samantha Stevins

3   took, are these all the documents that your original

4   Appendix C and your updated Appendix C are all the

5   documents that you've relied on?

6       A.   I'd just offer the same clarification that you

7   heard from Ms. Stevins.  Those are the materials I

8   reviewed.  Some of them I didn't rely upon.

9            MR. ALLEY:  Can we mark these as defense -- I

10           think we're on number -- is it Number 4, backup for

11           Tucker's second report?

12           (Defendant's Exhibit No. 4 was marked for

13   identification.)

14  BY MR. ALLEY:

15      Q.   If you determine there are additional opinions

16  that you plan to render outside of those two that you've

17  already rendered, will you notify us, because we'll want

18  to depose you on those opinions?

19      A.   If I determine I have additional opinions, will

20  I notify you?  And that is, you're talking about before

21  trial?

22      Q.   Yes.

23      A.   Yes, I'd be happy to notify you.  As I said

24  earlier, I have filed my second report here, which has my

25  opinions in it.  I don't intend to provide additional

31

1  opinions unless asked at trial by either you or

2  Ms. Stevins additional questions and at that point I'd

3  answer.

4      Q.   Well, you've been given additional documents to

5  review already.

6      A.   That's correct.

7      Q.   And you were given those last night?

8      A.   That's correct, but they did not --

9      Q.   And you brought them with you to the deposition

10 today?

11     A.   Because I had been provided with them and I'm

12 trying to be -- provide you with everything that you

13 requested in your subpoena duces tecum.  I did not rely

14 upon them clearly, because my report was written -- my

15 second report was written before I received these

16 materials that she gave me last night.

17     Q.   You reviewed them last night?

18     A.   I reviewed those materials last night.  They

19 did not go into my development of opinions for my second

20 report, because I hadn't reviewed them prior to writing

21 that report.

22     Q.   Can you go through -- let's talk about the

23 agencies where you've been employed.

24     A.   Yes.

25     Q.   How long were you in the FBI?

32

1        A.    I was with -- how long was I with the FBI?

2    From '69 to '71.

3        Q.    And approximately how many arrests did you make

4    when you were in the FBI?

5        A.    Well, Mr. Alley, let's see.  Given the fact

6    that that was 36 years ago, my recollection -- it would

7    just be strictly a guess at this point of how many

8    arrests that I made 36 years ago.

9        Q.    Is it more than a hundred?

10       A.    Probably not, because FBI agents weren't making

11   responses to calls.  They were doing investigation

12   follow-up.  Most of my work at that time were what were

13   called 26 cases or ITSMV, Interstate Transportation of

14   Stolen Motor Vehicles, and I might recover 30 vehicles

15   and make one arrest.  So probably less than a hundred.

16       Q.    Were you there for a full 24 months or were you

17   there less than 24 months with the FBI?

18       A.    Twenty-four months or thereabouts.  I don't

19   recall that either.  I don't remember whether that

20   includes the academy time of four and a half months or

21   not either.

22       Q.    But you've listed you've worked for the FBI for

23   two years.  Are you saying that you don't know whether

24   that includes the academy time?

25       A.    I don't recall what -- if it did include the

33

1  academy time, that's because I was employed when I went

2  to the academy.  That's what I'm saying.

3      Q.  Okay.  And what was your title at the FBI?

4      A.  Special agent.

5      Q.  In what area or what department or division

6  were you a special agent?

7      A.  I don't know that there is a division.  I was

8  assigned to the field office in Knoxville, Tennessee and

9  then I was reassigned as a resident agent.  I was number

10  two agent in a field office, a resident agency in

11  Morristown, Tennessee, and I covered six counties as a

12  geographical area.  And I worked any of the 196 federal

13  violations that agents were responsible for

14  investigating.  At the time that I was an agent, there

15  were 196 federal violations.

16      Q.  Okay.  And again, what area of law enforcement

17  did you specialize in?  What were you investigating?

18  Just any crimes?  Or as a special agent for the FBI, was

19  it motor vehicles?  What area were you --

20      A.  Well, as I said, I didn't have a specialty.  I

21  was assigned everything from White Slave Traffic Act,

22  that is, transportation of females across the state line

23  for purposes of prostitution, to interstate

24  transportation of stolen motor vehicles.  I did bank

25  robbery investigations, fugitive, ten most wanted

34

1  hunting, anything that the bureau assigned me to out of

2  those 196 violations, which I really don't recall all

3  196, but most of the work for me in the area in which I

4  was dealt with things like bank robbery and motor vehicle

5  thefts across state lines.

6      Q.   Do you remember any arrests that you made in

7  the FBI that were rewarding to you, that you're proud of?

8      A.   I was proud of all the arrests I made when I

9  was with the FBI.

10     Q.   Do you remember them?

11     A.   Do I remember some of them that I were

12  particularly proud of.

13     Q.   And how many do you remember that you were

14  particularly proud of?

15     A.   I particularly am proud of the fact that I

16  arrested a fellow by the name of Hayden Smith, who was

17  dealing in stolen motor vehicles.  And I was particularly

18  proud, because I recovered a vehicle that he had stolen.

19  And I took it to a law enforcement agency for custody

20  until I had a chance to have it retrieved.  And I have

21  reports that there were people in that local law

22  enforcement agency that were part of the auto theft ring

23  and, lo and behold, before I could get back to recover

24  that car, it disappeared.  The law enforcement agency

25  just lost the car.  So I was particularly proud when I

35

1    took that particular individual into custody and took him

2    before the federal magistrate.  His name was Hayden

3    Smith.

4         Q.   Are there any other arrests that you're

5    particularly proud of when you were working in the 24

6    months as a FBI agent?

7         A.   I think that's probably the one I recall the

8    most.

9         Q.   Do you recall any others?

10        A.   No, not right offhand.  A lot of them were

11   joint type activities.  For example, when I was called

12   over to Knoxville, Tennessee to help on a round-up of 16

13   or so criminals that Mr. Hoover himself was particularly

14   interested in, and I was assigned a certain number to go

15   out and watch and arrest.  I don't remember their names.

16        Q.   So other than less than a hundred and what

17   you've testified to, do you have any memory of how many

18   arrests you made as an FBI agent?

19        A.   I do not.

20        Q.   Can you narrow the number down to better than

21   under a hundred?

22        A.   No, Mr. Alley.  Like I said, that it has been

23   36 years ago, and I do not intend to try to give best

24   estimates or anything else.  I do not recall 36 years

25   later how many arrests that I made with the FBI 36 years

36

1    ago.

2         Q.   What was your job after the FBI?

3         A.   My job after the FBI was as police chief in

4    Morristown, Tennessee.

5         Q.   Why did you leave the FBI after 24 months?

6         A.   Multiple reasons.  One was that I had been

7    moved with the United States Navy when I was with them

8    several times, and then the FBI had moved me from D.C. to

9    Knoxville to Morristown, and then I was under orders to

10   go to Baltimore, Maryland.  I didn't want to go there.

11   So that was one reason.

12        Secondly, I had a father-in-law who had had a

13   serious heart attack and needed somebody to help him out,

14   and I didn't want to go to Baltimore.  I could help him

15   out if I stayed in East Tennessee region.

16        Third was a personal factor, that I had been

17   diagnosed with a terminal disease at that point and I was

18   very concerned about it.  It turned out to be improper

19   diagnosis.  They told me that I had lymphocytic cell

20   leukemia and I did not.

21        Q.   As the chief of Morristown, Tennessee how many

22   arrests did you make?

23        A.   How many arrests did I make?

24        Q.   Yes.

25        A.   Well, again, that was starting in '71 to '74,

37

1  so anywhere from 35 to 32 years ago, but I can tell you

2  that because of the size of that department, which was 45

3  officers, and because I started as a police chief and did

4  not go up through the ranks, I made it a point to do

5  police officer work.  And so I did criminal

6  investigations and I actually went out on patrol and did

7  that not only in Morristown, but throughout my law

8  enforcement career all the weigh up to my retirement.  I

9  made my last armed robbery arrest four months before I

10  retired as chief of police in Tallahassee.  There was a

11  big newspaper article about this chief out there still

12  making armed robbery arrests.

13      Q.   My question was, as chief of Morristown,

14  Tennessee do you remember how many arrests you made?

15      A.   I don't remember how many arrests.  I made

16  numerous arrests there.  I made 16 of them in one night.

17      Q.   You arrested 16 people in one night?

18      A.   That's right.  I was responsible of conducting

19  a major raid of 16 locations, bringing in 92 slot

20  machines, thousands and thousands and thousands of

21  dollars of illegal liquor.  It was a dry county at that

22  point.  And that night I guided our officers on 16

23  service of search warrants and personal arrests.

24      Q.   But these were -- you made 16 arrests that

25  night?

38

1     A.   I made the arrest of Mr. Frank Seals and Mr.

2 Billie Ray Lee personally.  I think the rest of them were

3 made by the teams that I was controlling going out there.

4     Q.   What I'm -- in this line of questioning I'm

5 trying to figure out, do you remember how many arrests

6 you made as -- chiefs aren't generally out there on

7 patrol and chiefs have their responsibilities, a lot of

8 administrative responsibilities, and I'm trying to figure

9 out if you're one of those chiefs that was out there

10 arresting people?

11     A.   Mr. Alley, if I can please try to clarify my

12 response and give it to you again?  I made it a point --

13 having been a police chief four times, I have an idea

14 what police chiefs do.  Given the departments I've

15 managed as a police chief ranged in size from 45 officers

16 in Morristown, Tennessee to over 400, well, almost 500 in

17 Tallahassee, clearly the job is an administrator.

18 However, because I believed in the concept called walk

19 around management, WAM, I made it a point to conduct

20 criminal investigations and to patrol on the streets

21 throughout my career all the way up until my retirement.

22     I had two uniforms.  One uniform said police

23 chief on it.  One uniform that just was a police

24 officer's uniform, which I wore in all my departments.  I

25 conducted criminal investigation.  Mary Russell murder

39

1  case, Gannell Ebbs (phonetic) murder case in Morristown,

2  Tennessee, all the way up to Tallahassee.  I can't think

3  of the victim right now, but a 16 year old girl was

4  beaten to death by her boyfriend with a flute in

5  Tallahassee.  And made my last armed robbery arrest, as I

6  said, four months before I retired.

7      Q.   Do you remember how many arrests you made as a

8  chief in Morristown?

9      A.   No, I don't.

10     Q.   What was your next job after the Morristown?

11 When you were in Morristown, did you have a training

12 division?

13     A.   No.  It was 45 officers in 1971.  I was the

14 training division.

15     Q.   Were there any grand juries against you or any

16 member of your agency when you were in Morristown?

17     A.   No.  Any grand jury against us?  No.  I don't

18 know what that means, but I think you're saying, were we

19 ever investigated by a grand jury?  Is that what you're

20 saying?

21     Q.   Was there ever an arrest made without probable

22 cause when you were in Morristown?

23     A.   Not that I recall.

24     Q.   Was there ever -- after you were the chief in

25 Morristown, where did you go?

40

1     A.   I moved to Hickory, North Carolina as chief of

2  police.

3     Q.   How long were you the chief there?

4     A.   From 1974 to 1977, about three years, three

5  years four months, something like that.

6     Q.   And how many officers did you have authority as

7  a chief of police?

8     A.   There were 92 employees, 60 full-time sworn, 17

9  part-time sworn, six dispatchers, six jailers, two

10 secretaries, one evidence technician, somewhere around 92

11 employees.

12    Q.   Did you have a training division?

13    A.   I was the training division.

14    Q.   Were there any grand jury investigations when

15 you were the chief there against you or any member of

16 your agency?

17    A.   No.

18    Q.   Were there any probable -- were there any

19 arrests made without probable cause when you were the

20 chief of police?

21    A.   Not that I was ever aware of.

22    Q.   Would you be surprised if there were all the

23 arrests had probable cause?

24    A.   Would I be surprised that -- say that again.

25    Q.   Strike the question.

41

1          After leaving that job, where did you go?

2      A.   I went to Asheville, North Carolina as chief of

3  police.

4      Q.   And how long were you there?

5      A.   A little over two years.

6      Q.   And the size of the force?

7      A.   It seems to me that was 162 officers, as I

8  recall.

9      Q.   Did you have a training division there?

10     A.   I think we had some training officers at that

11 point, yes.

12     Q.   Where there any grand jury investigations

13 against you or any members of your agency while you were

14 there?

15     A.   No.  I was hired as a reform chief in

16 Asheville.  That was a department had allegations of

17 corruption, photographs in the newspaper of trucks

18 backing up to the door unloading liquor for all the

19 officers at Christmas time, issues like that.  So I was

20 hired as a reform chief.  That's the reason the tenure

21 was just two years.

22     Q.   You were anticipating my next question.  That's

23 why you went on that?

24     A.   I don't know what your next question is.  I'm

25 just telling you why I was there and what I did.

42

1    Q.   Were there any arrests made while you were

2  there at that agency that were without probable cause?

3    A.   The probable cause is a constitutional

4  requirement for making an arrest and I was not aware of

5  any arrests being made without meeting the constitutional

6  requirements.  None were brought to my attention at

7  least.

8    Q.   Have you ever disciplined an officer for making

9  an arrest without probable cause?

10   A.   I think I've had situations where I reviewed

11 cases and had to unarrest, make sure the person was

12 unarrested.  Specifically, one comes to mind was taking

13 into custody, which I didn't believe had sufficient level

14 of proof to rise to the level of probable cause by a

15 sergeant in Tallahassee by the name of Raymond Henry and

16 had to order him to unarrest the individual.

17   Q.   Have you ever disciplined an officer as the

18 chief of police for making an arrest without probable

19 cause?

20   A.   Not that I recall.

21   Q.   After your two year tenure as chief of police

22 there, then you went to Tallahassee?

23   A.   That's correct.

24   Q.   And that's where you were chief for

25 approximately 14 years?

43

1      A.    Well, I started October the 15th of '79 and my

2  last day was January 1st, '94, whatever that is.

3      Q.    And do you recall how many arrests you made as

4  chief of police for Tallahassee?

5      A.    No, I don't.

6      Q.    Have you ever been the rank --

7      A.    Even -- let me make sure you understand what

8  I'm saying there.  Even the ones, for example, like the

9  around robbery arrest, where the last one I told you

10  about that I made before I retired, I didn't put myself

11  down on the arrest ticket.  I took the person into

12  custody, chased him down in the street, and got him under

13  control with my semi-automatic firearm, but had another

14  officer fill out the arrest ticket so I didn't have to go

15  to court.

16      Q.    Well, you've given opinions that two officers

17  made an arrest without probable cause and there's a

18  difference who actually makes the arrest and who puts

19  their name down.  Are you saying that you made the arrest

20  and you didn't put your name down as the arresting

21  officer so you wouldn't have to go to court?

22      A.    That's correct.

23      Q.    Do you think that's an accurate depiction?

24      A.    Do I think that's inaccurate depiction or is

25  that an accurate?

44

1       Q.   Please let me finish my question.  Do you think

2   that's an accurate depiction of who the arresting officer

3   is, if you're the arresting officer, but you don't put

4   your name down as the arresting officer so you can avoid

5   the inconvenience of court?

6       A.   I don't know exactly what you're asking me.

7   I'm just telling you that the man ran out in front of me.

8   I was listening on the radio of an armed robber and I had

9   a perfect description of him.  I'll never forget it.

10  Because it was light green pair of Bermuda shorts and a

11  watermelon colored shirt, tank top.  And when he ran out

12  in front of me, I pretty well believed I had probable

13  cause to believe that was him given the fact he was

14  running too.

15          And I chased him down and ordered him to stop,

16  lay prone, kept him covered with my weapon.  I took him

17  into custody.  When another officer arrived on the scene,

18  they put cuffs on.  I did not go to court.  I let another

19  officer go to court on that.

20      Q.   Were you the arresting officer?

21      A.   As far as I'm concerned, I was.

22      Q.   Did you put -- on your report where it says

23  "arresting officer," did you put your name down?

24      A.   I have no idea.  I didn't fill out the reports.

25  It was one thing for me to go out and police.  It was

45

1   another thing for me to sit over in courtroom waiting to

2   go into the courtroom to testify at a trial.

3        Q.    And is that -- on all the things you've

4   testified to about all the arrests that you have made,

5   you're not the arresting officer on the report, but

6   you're the man who made the arrest?

7        A.    No, that's not the case on all my -- that's not

8   the case at all.

9        Q.    Do you recall how many arrests you've made in

10  your career approximately where you're identified as the

11  arresting officer?

12       A.    Well, as I was getting ready to say, clearly

13  when I was an agent with the FBI, my own name went down

14  when I made an arrest.  When I was with Morristown Police

15  Department, which was a smaller department, and I was

16  more what would be called a working police chief in that

17  size department, 45 officers, I went down on the arrest

18  ticket on those.

19            But as I moved up in size of department and my

20  managerial responsibilities increased, I did less of

21  going to court, and I scheduled routinely my activities

22  in the field.  My secretary would schedule me to go out

23  and police, for example, in Tallahassee.  So that I could

24  go out and do that.  And I required my command level

25  officers do that too, much to their chagrin.

46

1     Q.   The question again is, do you recall how many

2 arrests you made?

3     A.   No, I don't recall.

4     Q.   Thank you.  I'm going to ask you to give me

5 some definitions.

6     A.   All right.

7     Q.   Can you define what is an equivocating fact?

8     A.   Sure.  Equivocal facts are facts that can be

9 interpreted multiple ways.  For example, they were in a

10 dispute.  Well, that doesn't mean anything until you

11 investigate it to find out what that means.  It can go --

12 after investigation it could result in incriminating

13 information against one person and exculpatory

14 information against the other person.  So that's an

15 equivocal fact and that requires an investigation to

16 determine whether it is a neutral, meaning nothing, it

17 doesn't mean anything, or it's incriminating or it's

18 exculpatory in nature.

19     Q.   Can an equivocating fact change into an

20 incriminating fact?

21     A.   I think that's what I just said.

22     Q.   Can you define what an incriminating fact is?

23     A.   Yes, it's one that tends to prove that

24 something in fact happened, incriminating.

25     Q.   Can you define an exculpatory fact?

47

1      A.    That's one that would tend to clear a person.

2      Q.    Can you define active resistance?

3      A.    Can I define active resistance?  Yes.

4      Q.    Will you please define active resistance?

5      A.    Actually pulling away, moving, as opposed to

6  passive, just saying, no, I'm not going to do it or just

7  not moving at all.

8      Q.    Can you define what passive resistance is

9  please?

10      A.    I think I just did.  It would be like me

11  sitting here and you saying get up and I don't respond.

12  I just resist by passively sitting there.

13      Q.    Can you define what's meant by soft hands?

14      A.    Well, yes and no.  First of all, there's not a

15  universal definition.  You're talking about something

16  that comes from law enforcement language used in what are

17  called continuums of force.  And although I'm totally

18  familiar with continuums -- in fact, was on the criminal

19  justice standards and training commission.  In fact, I

20  was vice chairman, if I'm not mistaken, when that was

21  developed in Florida and approved by the Florida

22  Department of Law Enforcement in Florida.

23           But that's not how use of force cases are

24  analyzed and resolved by courts.  No court accepts

25  continuums, so I really don't pay any attention to the

48

1   hundreds of different kinds of continuums there are out

2   there in the law enforcement arena today.  Soft hands in

3   Albuquerque may mean something completely different than

4   soft hands in Fort Myers.

5        Q.   Can you define what is meant by soft hands?

6        A.   It's usually interpreted as an open hand --

7   open hand technique, just touching the individual, as

8   opposed to using the closed hand.

9        Q.   But do you use soft hands in your reports and

10  do you consider those or use those in your reports?

11       A.   In what kind of reports?

12       Q.   In an analysis on whether there's an excessive

13  use of force.

14       A.   I do not at all use those in my reports.  As I

15  said, the question is not whether or not an officer

16  complied with his department's continuum of force.  That

17  is in fact a question for the administration for

18  administrative culpability whether the officer followed

19  departmental policy.  It's not a question for the law

20  enforcement litigation consultant or expert witness.

21       The question for the litigation consultant is

22  whether or not the use of force was objectively

23  reasonable under the legal standards that are established

24  for the use of force, and that's Graham v. Connor, 1989,

25  U.S. Supreme Court decision, and Tennessee v. Garner, the

49

1  1985 decision, if it was a deadly force case.

2      Q.   Why wouldn't you use soft hands analysis in

3  your reports?

4      A.   I just answered, because that's not an

5  appropriate way to analyze.  It's one of the criticisms

6  that frankly I have with Mr. David M. Grossi's expert

7  report.  He analyzes it using a continuum of force and

8  not -- it's not an analysis under the objective

9  reasonableness analysis as established by the Grant v.

10 Connor decision.

11     Q.   Can you define what is meant by an intermediate

12 touch weapon?

13     A.   I can again tell you the same answer and that

14 is that I know what an intermediate weapon it.  That's

15 generally a -- something like -- and I'm certified on

16 it -- a PR24 side handle baton.  It could be an

17 expandable baton.  That's usually called an intermediate

18 weapon.

19          Some electronic control devices, ECWs, ERDs

20 they're called, depending on who you're asking,

21 electronic restraint devices are put in the intermediate

22 category.  But I'm not going to try to give you somebody

23 else's definition of -- what did you call it -- an

24 intermediate touch weapon?  Is that what you called it?

25     Q.   Yes.  I'm asking for your definition of it.

50

1      A.   I just gave you the best definition I can give.

2 It's an intermediate level weapon.  It's not a deadly

3 weapon and it's not a soft hand technique.

4      Q.   Define the use of force continuum.  Can you do

5 that please?

6      A.   Yeah, I'll be happy to.  How about if I do it a

7 better way and I just give you an article that I wrote on

8 it?

9      Q.   I'll take that, but can you define it for the

10 definition please?

11      A.   Yeah, I'll be glad to, but let me give you the

12 article too, okay, since I brought it along.  I thought

13 maybe that might come up, so I thought I'd just bring it

14 along.

15           MR. BURANDT:  Do you have his last report?

16           MS. STEVINS:  Mr. Burandt just asked a moment

17      ago.  Do you want the first report or the second

18      report?  The final one?

19           MR. BURANDT:  The final one.

20           MS. STEVINS:  I'm going to provide to both

21      Mr. Alley and to Mr. Burandt on the record copies of

22      the final report that was provided to me yesterday,

23      the signed version.

24           MR. ALLEY:  You're still going to follow the

25      rule and file it and send it to us with the

51

1  disclosure?

2      MS. STEVINS:  Exactly, yes.

3      MR. ALLEY:  Can we keep moving forward now?

4      THE WITNESS:  I'm trying to move forward.  I

5  hope you don't think --

6      MR. ALLEY:  No, I wasn't talking to you.  I'm

7  sorry.

8      THE WITNESS:  I'm sorry.

9      The use of force continuum is nothing more than

10  graphic display used to train law enforcement

11  officers in a simple format that's easily

12  remembered, and that is generally done in a way

13  where you'll show a certain level of resistance

14  offered by a suspect and a level of response that

15  the agency believes is a reasonable response to the

16  level of resistance of the suspect.

17      Unfortunately, and as I now give you this

18  article that I report called "Poor Training:  The

19  Real Story Behind The Headlines," which was

20  published in a law enforcement magazine several

21  months back, it describes the problems with that

22  approach to training of law enforcement officers.

23      One problem with it is that the graphic display

24  does not consider things like the agent, the

25  suspect, the size of the suspect, the age of the