52

1   officer, the size of the officer, or anything like

2   that.  So, you know, if you say that if a person

3   offers a threat of a knife, that that then justifies

4   the use of deadly force and you can shoot that

5   individual, I would say to you that that is very

6   problematic, because my dad may step out in the yard

7   at the age of 92 in his underwear to get the

8   newspaper and be fearful that he's going to be

9   assaulted because he's suffering a little bit of

10  Alzheimer's and he may carry a kitchen knife out

11  with him to get the mail.

12      If a police officer came by and saw him at the

13  age of 92 in his frail condition in his underwear

14  with a butcher knife, I would hate to think that

15  that officer, even though his use of force continuum

16  may say that an appropriate response to that would

17  be shooting him, I would hate to think that an

18  officer would do that.  Frankly, that's what we have

19  happening across the country and that's the reason

20  why I wrote that article.

21  BY MR. ALLEY:

22      Q.   Move to strike as unresponsive.

23          This article is not dated.  I haven't had a

24  chance to read it.  But could you date the article for me

25  please?

53

1      A.    I can do better than that.  I believe tell you

2  if you look at my C.V., it was published in the Law

3  Enforcement Trainer Magazine in the

4  October/November/December 2005 issue.

5      Q.    Can you date the article please?

6      A.    I just did, 2005.

7      Q.    October -- okay, what is it?

8      A.    October/November/December issue of Law

9  Enforcement Trainer Magazine 2005.

10     Q.    Do you know when you wrote the article?

11     A.    Prior to that.

12     Q.    Prior to that.  So I have that, it's sometime

13  prior to that three months range?  Was it ten years prior

14  to that, a year prior to that?

15     A.    Oh, no, no, no, no.

16     Q.    I'm just trying to find out when you wrote the

17  article, sir.

18     A.    Let's just say I wrote it and finished it off

19  in September or a couple months before that.  They had to

20  have received it and review it and accepted it for

21  publication and then schedule it for publication, so a

22  few months before October of 2005.

23     Q.    Okay, thank you.  So is the use of force

24  continuum a matrix system?

25     A.    It sometimes is called a matrix system.  That

54

1   would be another way of saying a graphic display, yes.

2       Q.   Would you define it that way?

3       A.   I would accept that.  Some people call it a

4   matrix.  Some people call it a continuum.  Some people

5   call it a spectrum.  Some people call it -- they have

6   different names for it.  As I said, there's hundreds of

7   those out there.  There's not one that's generally and

8   universally accepted.

9           For example, Mr. Grossi says, when he does his

10  evaluation, that the officers responded in conformance

11  with the continuum of force.  The fact of the matter is,

12  they did not respond in conformance with the

13  International Association of Chiefs of Police use of form

14  continuum, which suggests that OC spray be used before

15  hands-on.  So it depends on whose continuum you want to

16  use.  Both are wrong.  You have to analyze this under the

17  Graham v. Connor standard, not the use of force

18  continuum.

19      Q.   Is the International Association of Chiefs of

20  Police -- and I'm going refer to that as the IACP -- is

21  that a legal standard?

22      A.   No, it's not a legal standard.  That's a

23  professional association not much different maybe than

24  the American Bar Association that promulgates protocols

25  which they recommend to professionals.

55

1    Q.   What's your definition, Mr. Tucker, of a legal
2  standard?

3    A.   That standard is established by law.

4    Q.   Have you used the use of force continuum, the
5  matrix system, or the spectrum system, whatever term you
6  want to give it, have you used that in your analysis of
7  this case of whether the officers involved used an
8  appropriate level of force?

9    A.   I've responded to -- because the inquiry was
10 made as to compliance with the continuum, but it is not
11 the standard.  You know, when this goes to court, the
12 court is not going to be the least bit interested in the
13 continuum other than from how the officers are trained.
14 They will -- the court will only analyze this use of
15 force under the Graham v. Connor, Tennessee v. Garner
16 standard, as you know.

17   Q.   I'm not asking you on what the Judge is going
18 to do.  My question to you is:  Have you used and applied
19 the use of force continuum, the matrix system, or
20 spectrum system in analyzing the use of force in this
21 case?

22   A.   I believe I used the continuum and responded
23 that -- can I have my report back to look at?

24   Q.   Sure.  Which report, your first report or your
25 second one?

56

1     A.   Well, the final one, report number 2.

2     Q.   I'm not sure which one.

3     A.   I believe that in opinion number 7 of my final

4 report I refer to the General Order of the Fort Myers

5 Police Department that was in place at the time, 1.5

6 entitled Use of Force, which relies on the continuum, and

7 I did refer to that, but the rest of my opinions refer to

8 the force as either being objectively reasonable or not,

9 and that's the legal standard established by Graham v.

10 Connor.

11     Q.   So is it only opinion number 6 that would use

12 the use of force continuum in your analysis in this case?

13     A.   I didn't say 6. I said 7 of my final report, I

14 think.

15     Q.   Sir, approximately how many times have you been

16 retained as a litigation consultant?

17     A.   Approximately 350 to 400 times. I don't keep

18 a -- over 350 times.

19     Q.   And can you break down approximately how many

20 have related to the use of force?

21     A.   Yes. I guess I must anticipate a lot of what

22 might be asked, so I brought it along. As of -- I

23 actually prepared this prior to the last time I was

24 scheduled for deposition.

25     As of 12/3/06 I had about 20 percent of my

57

1   cases were use of force cases, and I estimated that to be

2   42 use of force cases that I provided deposition or trial

3   testimony.  And so out of the total number of cases that

4   I've had at that point, I estimated about 35 percent has

5   been testimony in use of force cases that have been for

6   the defense out of the cases that I've had so far.

7       Q.   I'm sorry, how many for the defense?

8       A.   About 35 percent of my use of force cases since

9   I've been doing litigation consulting have been for the

10  defense.

11      Q.   So is what you're holding in your hands, is

12  that an update to your deposition trial testimony?

13      A.   No, that is not.

14      Q.   Okay.

15      A.   I brought an update to Appendix B for you, if

16  you'd like.

17      Q.   Yes, I would.  Thank you.

18      A.   I have it here.  Would you like that now?

19      Q.   Yes, please.  Thank you.

20          MS. STEVINS:  Do you want to attach those, any

21      of the A, B, C to his final report, because that's

22      how we would have presented it to you?

23          MR. ALLEY:  No, I trust you'll do that when you

24      submit it, but I was going to ask about that, and

25      that will speed it up.  Thank you, Ms. Stevins.

58

BY MR. ALLEY:

    Q.   Can you show me what you were reading on the defense cases?  Do you mind if I look at that?

    A.   I will be happy to.

    Q.   Thank you.  Just so I have an understanding of what you're talking about here.  This is a list of cases for the defense on use of force?

    A.   That's correct.

    Q.   Okay.  And in these cases and the cases that you've testified to that you analyzed the use of force, did you use the use of force continuum, the spectrum or the matrix.  Is that a commonly -- would you use that typically or commonly in analyzing whether use of force is excessive or appropriate?

    A.   No, the answer to that is clearly no.  Now, let me qualify this.  Whenever I'm asked to do an analysis of a use of force situation by a law enforcement officer, I look at how the officer was trained.  And typically law enforcement agencies publish their own use of force continuum for guidance to the officers as to what the department believes is a reasonable response to a suspect's resistance, level and that is put into the spectrum, continuum, matrix, whatever you want to call it.

    Q.   Did you have an use of force continuum when you

59

1   were a chief in Tallahassee?

2       A.   I did.   I was on the commission, as I said,

3   that developed that for the state of Florida.   But if you

4   are looking to do an analysis of use of force, it has to

5   be done under the tests established by the U.S. Supreme

6   Court, so-called object subjective reasonableness

7   analysis under Graham v. Connor, the Fourth Amendment.

8       Q.   Can you define the levels on the use of force

9   continuum?

10      A.   Can I define the levels on suspects' actions or

11  police officers responsive to suspects actions?   Yes, on

12  both.   Is that what you want?

13      Q.   No.   I'm asking, what's your definition of the

14  first level of the use of the force.

15      A.   Well, again, you're asking me a generic

16  question.   There are hundreds, literally, of different

17  Florida -- Florida Department of Law Enforcement has its

18  use of force continuum.   Police departments have theirs,

19  which may or may not be the same as Florida Department of

20  Law Enforcement.   Federal law enforcement training

21  center, FLETC, has their use of force continuum.   New

22  York City police.   Everybody has them.   Now, what is the

23  question?

24      Q.   Can you break down the use of force continuum

25  by levels?

60

1     A.   I can give you one, yes, example of that.

2     Q.   The use of force continuum that you applied for

3 your opinion number 7.

4     A.   I didn't.

5     Q.   Oh, I thought you said opinion number 7 was --

6     A.   Can I have my report back again?

7     Q.   You have it right there, Mr. Tucker.

8     Did I misunderstand your testimony?  I thought

9 I said you applied the use of force continuum in your

10 second opinion in number 7?

11     A.   I applied your General Order, which uses a use

12 of force continuum, that is General Order 1.5, which what

13 I'm basically saying in the report is that the officer

14 violated your own department's General Order, which only

15 goes to the administrative culpability.  It doesn't --

16 you know, that doesn't go to the civil culpability, if

17 you will.  As I said earlier, when I look at use of force

18 cases, I look at them and analyze them under the legal

19 standard.  Right now there are only two that I'm aware

20 of.

21     Q.   So you didn't use the use of force continuum in

22 the matrix or the spectrum in your analysis for opinion

23 number 7?

24     A.   The answer to that is, yes, I did to point out

25 that the officers -- your officers, Officer Millhorn

61

1   violated the departmental General Order 1.5 --

2       Q.   Okay.

3       A.   -- for administrative culpability reasons.

4       Q.   Can you describe the levels of the use of force

5   on that continuum that you use in your opinion number 7?

6       A.   Well, he was told by the continuum in the use

7   of force policy to exhaust other reasonable alternatives

8   before engaging in physical force, and I'm saying that he

9   did not exhaust other reasonable alternatives.  He didn't

10  give any other verbal commands or, for example, use OC or

11  soft hands before using the arm bar technique, and

12  frankly that only goes to whether or not he's

13  administratively culpable.

14      Q.   Move to strike as unresponsive.

15           Can you define the levels of force that you --

16  in the use of force matrix or continuum that you analyze

17  in your opinion number 7?  I'm not asking you about --

18  we'll get into Millhorn and Reiman later.  But I'm just

19  asking you, can you define the use of force continuum,

20  the different levels that you used in rendering that

21  opinion?  Do you know what the different levels are?  Can

22  you define them for me?

23      A.   By going to your use of force policy in Fort

24  Myers and description of that continuum, yes.

25  Typically -- and I'm trying to be responsive frankly, but

62

1    I just --

2        Q.   Thank you.

3        A.   There are just -- there's a matrix or draft,

4    whatever you want to call it, that generally lists

5    suspect resistance levels from passive resistance to

6    active resistance to aggressive resistance to aggravated

7    resistance to deadly force resistance, which means that a

8    law enforcement officer, according to the matrix, can

9    respond in various ways all the way ranging from

10   so-called just being present to all the way up to the

11   extreme of using deadly force.

12            There are hundreds of those things around the

13   country.  I do not rely upon them for -- and did not rely

14   upon them for the question that is in this case, and that

15   is:  Was the use of force objectively reasonable?  I used

16   the legal standard when I do that, which is established

17   by Graham v. Connor, U.S. Supreme Court decision.

18       Q.   As a litigation consultant --

19            MR. BURANDT:  I'm sorry.  Can you say that

20       again?  Graham v. Connor?

21            THE WITNESS:  Yes.

22            MR. BURANDT:  That's who you're relying on?

23            MR. ALLEY:  As a litigation --

24            THE WITNESS:  I'll complete my answer.  There

25       are two U.S. Supreme Court decisions that I rely

63

1          upon.   One is the Tennessee v. Garner that was a

2          1985 decision, May of 1985, that established -- that

3          put use of force by law enforcement officers under

4          the Fourth Amendment reasonableness standard.  And

5          it only dealt with use of deadly force in arrest

6          situations.

7              Then in 1989 there was another Supreme Court

8          decision, Graham v. Connor, which dealt with all

9          other types of situations, that is, detention and

10         less than deadly force.  So I use both of those.

11             MR. BURANDT:  Okay.

12    BY MR. ALLEY:

13         Q.   As a litigation consultant in the cases that

14    you've testified for, did you use the use of force

15    continuum, matrix, or spectrum or whatever, whatever you

16    want to call it, did you use that in those analyses?

17         A.   No.

18         Q.   What is -- what is ASLET?

19         A.   What is or what was?

20         Q.   Help me out.  Explain it please.

21         A.   Well, I can't tell you whether it's past or

22    present, because I'm not sure what the status is.  It was

23    an organization called American Society of Law

24    Enforcement Trainers, and then it went back to American

25    Society of Law Enforcement Training.  It was a

64

1  professional association of people involved in providing

2  law enforcement training services.  And I was a member.

3  So was the defense expert, Mr. Grossi.  He was on the

4  board of directors.

5         There was a major dispute that erupted among

6  the board of directors as to whether or not there was

7  being a fraudulent expenditures of dollars of the

8  organization, as I understand it, and it went into

9  litigation and bankruptcy, and I'm not sure if that

10 agency has been completely dissolved at this point or

11 not.  I was only a member.

12     Q.    Okay.  Is it a legal standard?

13     A.    Is it a legal standard?

14     Q.    Yes, sir.

15     A.    Is what a legal standard?

16     Q.    Is the professional organization ASLET and the

17 materials that they produce, are they legal standards?

18     A.    No.  The only legal standards are what I've

19 already said.

20     Q.    Can you define deadly force?

21     A.    Yes.

22     Q.    Will you please do so?

23     A.    Any force reasonably likely to cause serious

24 bodily harm or death.

25     Q.    Can you define an arm bar technique?

65

1      A.    I could give you -- there are several versions

2  of that.  What do you want, straight arm bar technique?

3           In anticipation of what you were going to ask

4  me, I have brought some graphic displays along for you so

5  you have that.

6      Q.    When I ask a question, "can you define an arm

7  bar technique," did you laugh?

8      A.    Did I what?

9      Q.    Did you laugh?

10     A.    Did I laugh?

11     Q.    Yes.

12     A.    I didn't intend to.  If I didn't I'm trying to

13  say to you --

14           I'm sorry, what?

15           MS. STEVINS:  I didn't say anything.

16  BY MR. ALLEY:

17     Q.    Could you define an arm bar technique please?

18     A.    Well, if you're talking about a straight arm

19  bar technique, a technique that uses mechanical appliance

20  and balance displacement to take under control a

21  resisting subject from a standing position.  That's the

22  definition from the FDLE Academy, Florida Department of

23  Law Enforcement Academy, which I brought along for you.

24     Q.    Okay.  Thank you.

25     A.    Do you want this?

66

1           MR. BURANDT:  Do you have Millhorn's or

2     Reiman's deposition in that pile?

3           MR. ALLEY:  It is, but why don't you take it

4     from this?  Take it from back here.  Help yourself.

5           MR. BURANDT:  Are his reports in there too?

6  BY MR. ALLEY:

7     Q.  Does it depend where you're located on whether

8  a choke hold is considered deadly force?

9     A.  Does it depend on where you're located?

10  Mr. Alley, I am not trying to be difficult.  I really am

11  not.  I'm trying to be as courteous as I can and polite

12  and responsible to your questions.  However, I do have to

13  tell you that the questions you're asking are very

14  difficult for me to interpret what you're asking.

15         Are you asking this question now as to where

16  you are geographically located, for example, Los Angeles

17  as opposed to Florida?

18     Q.  When I get to a question, Mr. Tucker, that you

19  don't understand, please say you don't understand.  I'm

20  asking these questions, I'm going to hold you to them.

21  If you don't understand it, please point out you don't

22  understand and ask me to repeat it.  I don't want you to

23  speculate or assume or something like that.  I just want

24  you to --

25     A.  That's what I'm trying to do.  Clarify the

67

1   question for me.

2       Q.   Does it depend on where you're located on

3   whether a use of force technique would be considered

4   deadly?

5       A.   Now, I'm going to ask for clarification of

6   that.  Are you saying, does it matter if you're in Los

7   Angeles Police Department as opposed to Raleigh, North

8   Carolina Police Department?

9       Q.   Yes.

10      A.   Then the answer to that is yes.  For example,

11  in Los Angeles they studied it and in fact -- yes, they

12  studied it and concluded that it is likely to cause

13  serious bodily harm or death if you used a choke hold.

14  In other departments around the country they haven't said

15  it's necessarily deadly force.

16      Q.   Would that same apply to an arm bar technique?

17  Would that same type of analysis apply?  Is it in one

18  location in the country it could be a deadly force and in

19  another location in the country it could be non deadly

20  force?

21      A.   I do not know of anyplace that an arm bar

22  technique is considered to be deadly force.

23      Q.   Is it fair to say that standards for training

24  police officers vary from state to state?

25      A.   It is fair to say that, yes.

68

1      Q.   Are you familiar with any nationally recognized

2    standards regarding training methods available to police

3    officers?

4      A.   Am I familiar with national -- clarify.  What

5    are you talking about?

6      Q.   Are you familiar with any nationally recognized

7    standards regarding training methods available to police

8    officers?

9      A.   Training methods?  No.  If you're talking about

10   just training in general, I would say that the IACP does

11   in fact publish documents, protocols on training, for

12   example, on use of force, which they'll say they should

13   have recurring refresher training and it should involve

14   training in discretion in judgment as well as skill.

15     Q.   Did you rely on any IACP training keys or

16   materials in forming your opinions?

17     A.   I referenced IACP protocols in my report, yes,

18   regarding what is domestic violence and how domestic

19   violence cases should be investigated, for example.

20     Q.   Now, you're using the term reference, reviewed,

21   and relied on.  And I'm not trying to be tricky here.  I

22   just want to know, when you issue a report -- when you

23   issue and render your opinions, do you base them on

24   documents and evidence that you rely on that you review

25   or that you -- is it based on your training and

69

1   experience?   What's your -- what's the difference between

2   a document that you've referenced in your report versus a

3   document that you relied on in your report?

4       A.    I think the simplest way for me to answer that

5   question is just to refer you to my report on page 4

6   where I say:  "The basis and reasons for my opinions are

7   premised upon my education, my training, my experience,

8   my knowledge of law enforcement standards, my analysis

9   and study in the field, through consulting professional

10  literature, through seminars, the facts of the case

11  presented, and the materials reviewed."  So the answer

12  would be all of those things that you said, yes.

13      Q.    Okay.  So the materials that you reviewed do go

14  into the basis of your report?

15      A.    It's part of what goes in, yes.

16      Q.    Thank you.

17            What specific IACP training, keys, or materials

18  did you use in rendering your opinion in this case?

19      A.    Well --

20      Q.    And I'm talking both opinions.  Sorry for the

21  interruption now.

22      A.    Both opinions or both reports?

23      Q.    Both reports.

24      A.    Well, one is inclusive of the other, so all I

25  need to do really is look at the report number 2, report

70

1   of final opinions to answer that question.   And I used

2   the IACP, International Association of Chiefs of Police

3   training key -- I forget the number of it right offhand,

4   but I reference it in here -- training key number 136

5   entitled probable cause, which I attached to the report.

6   And that's the one that has been around for a long, long

7   time and tells officers that they should not use

8   equivocal or neutral facts in making a probable cause

9   determination, that it's a balance sheet process when

10  you're doing a probable cause determination.   You have to

11  consider exculpatory information versus incriminating

12  information and reach a decision as to whether or not

13  sufficient level of evidence is there to --

14      Q.   I'm sorry.   I don't mean to interrupt, but I'm

15  just asking you for the specific training keys that you

16  used in this report.   You said 136.

17      A.   I used training key number 136.   I used the

18  National Law Enforcement Model Policy Center model policy

19  entitled Domestic Violence, which I attached as Appendix

20  E.   I think those -- I used IACP model policy entitled

21  Use of Force, which I attached to my report as Appendix

22  F.   And I brought with me --

23      Q.   I'm sorry.   What's the training key number on

24  that?

25      A.   Mr. Alley, it's not a training key.

71

1    Q.   Okay.

2    A.   There's a difference.  There are training keys

3  that are published by the International Association of

4  Chiefs of Police in 30 some volumes, and those are handed

5  to instructors, so the instructor don't have to go out

6  and learn the material and provided them to teach.

7  That's part of what the IACP does.  The IACP joined in

8  with the Bureau of Justice Assistance in 1988 into what

9  is called the National Law Enforcement Policy Center.

10  That's different than training keys.

11    Q.   What's Exhibit F?

12    A.   Exhibit F is a model policy that is published

13  by the National Law Enforcement Policy Center.

14    Q.   Okay.  And is there a reference -- and you have

15  attached that in your second report?

16    A.   I have.  Yes, I have.

17    Q.   In your career as a law enforcement officer,

18  other than the title of chief of police and special agent

19  for the FBI, did you have any other titles or ranks?

20    A.   Yes.

21    Q.   Can you please explain?

22    A.   I'm currently a major in the Hamblen County

23  Sheriff's Department where I live.

24    Q.   What are you tossing to me?

25    A.   That's my identification card as a major in the

72

1   Hamblen County Sheriff's Department in Hamblen County,

2   Tennessee.

3       Q.    Is this on your C.V. or your resume?

4       A.    No.  I only list law enforcement employment.

5   So I've been a deputy sheriff several times.

6       Q.    Can we photocopy this?

7       A.    Which ones do you want?  This is just as a

8   deputy.  That's under the ex-sheriff.  That's the

9   currents sheriff.  That's my major.  You're welcome to

10  photocopy if you'd like.

11      Q.    So the question was:  In your career as a law

12  enforcement officer, what are the different titles under

13  which you served -- the question was:  In your career as

14  law enforcement officer, other than chief of police and

15  special agent for the FBI, are there any other titles or

16  ranks you served in law enforcement?  And you're showing

17  me -- you're saying that you're a deputy sheriff?

18      A.    The answer to the question in totality --

19      Q.    What's the answer to the question?

20      A.    In full would be, I was also a deputy sheriff

21  in Hamblen County in 1971 to 1974.  I was a deputy

22  sheriff in Leon County as part of a big men narcotics

23  task force from 1979 to 1980, a very short period of

24  time, because that sheriff was defeated, went out.  I was

25  a deputy sheriff under Otto Perky in Hamblen County,

73

1   Tennessee until the new sheriff came in, Esco Jarnigan

2   here recently.

3           He's a person that I hired as a police officer

4   30 years ago.  He asked me if I would train his

5   department on use of force and review policy for him, and

6   I said I would for a small salary, which we agreed to,

7   and he made me the rank of major to do that.  I've

8   already provided 17 hours of use of force training for

9   his department and have provided him with the policies

10  from the National Law Enforcement Policy Center and will

11  be reviewing his general order manual.

12      Q.   And are all those things you just testified to

13  on your curriculum vitae?

14      A.   I didn't understand the question.

15      Q.   On your use of force reports that you've issued

16  that you've identified, you have attached as Appendix A

17  your curriculum vitae, criminal justice experience.  Are

18  all those titles that you just testified to on your

19  curriculum vitae?

20      A.   No.  You know, I considered my employment as

21  chief of police and special agent to be my primary

22  activities.  I also don't have on here that I'm -- I was

23  a commander in the United States Navy, but I didn't think

24  that was relevant to, you know, rendering a law

25  enforcement opinion.

74

1    Q.   Okay.  Can I photocopy your --

2    A.   Sure.

3    Q.   Thank you.  We don't need to mark it, but we'll

4 take a copy of that.

5        MS. STEVINS:  We would just ask for purposes of

6        attaching it to the transcript that his Social

7        Security Number just be blacked out.

8        MR. ALLEY:  Yeah, I don't want to attach it to

9        the transcript.  I don't want your Social Security

10       Number.

11       MS. STEVINS:  You can photocopy it.  We'd just

12       ask that it get redacted, just the Social Security

13       Number.

14 BY MR. ALLEY:

15   Q.   I don't want your address.

16   A.   I'm not worried about it.  Go ahead and just

17 whatever.

18   Q.   Well, in the State of Florida I don't want your

19 address.

20   A.   Okay.

21       MR. BURANDT:  There's a privilege.

22   A.   Yeah, that's right.

23 BY MR. ALLEY:

24   Q.   You know that.  You were the chief of police in

25 Tallahassee for 14 years.

75

1        A.    Yeah.   Everybody knew where I lived.   I was in

2    the phone book.

3        Q.    What would you consider -- do you know what the

4    job responsibilities are for a patrol officer at Fort

5    Myers Police Department in or around 2004?

6        A.    Well -- do I know?   Yeah, I would have a

7    general -- I've not reviewed their job description in

8    Fort Myers, but given the fact that I have reviewed job

9    task analysis --

10       Q.    Can you tell me what you know they are?

11       A.    Depends on their assignment.   Are you talking

12   about a general field officer, patrol officer?

13       Q.    Patrol officer.

14       A.    Respond to calls for services, dispatch by

15   dispatch, conduct preliminary investigations, file

16   reports, take action if you observe a crime being

17   committed, generally speaking, preventative patrol,

18   administrative responsibilities.

19       Q.    What are the job responsibilities -- do you

20   know what the job responsibilities are of the chief of

21   police in or around 2004?

22       A.    Which chief of police?

23       Q.    Fort Myers Police.

24       A.    A chief of police's responsibility generally is

25   to plan, organize, direct, and control the activities of

76

1  a municipal police agency or county police agency if it's

2  a county agency.

3      Q.   What duties increase as you go up the chain of

4  command?

5      A.   I have no idea what you mean by that question.

6  Would you please clarify it?

7      Q.   Well, have you ever been a patrol officer?

8      A.   As I said, yes, I've worked as a patrol officer

9  in all the departments in which I was the chief of

10  police.

11      Q.   But have you ever been the rank of a patrol

12  officer?

13      A.   No.

14      Q.   As a chief of police have you ever arrested an

15  officer -- or a suspect without probable cause when you

16  were the chief?

17      A.   Have I ever arrested somebody without probable

18  cause?

19      Q.   Yes, sir.

20      A.   No, I haven't.

21      Q.   Did you ever discipline an officer -- I already

22  asked you that.  Did you ever discipline an officer for

23  arresting a suspect without probable cause?

24      A.   I don't know if there was any discipline that

25  went along with it or not.  I did make sure that the