77

1   person was unarrested because there was a lack of

2   probable cause.

3        Q.   Can you elaborate on your answer?  What do you

4   mean by you don't know if there was any discipline?

5        A.   That's what I was getting ready to do, but I

6   didn't know if you wanted it or not, but I will

7   elaborate.  I always divided activities of law

8   enforcement officers into three categories, errors of

9   skill, errors of judgments, errors of heart.

10            If it's an error of skill, it doesn't do me any

11  good to discipline them.  If an officer doesn't know how

12  to write a report, a traffic accident investigation, for

13  example, and I send him home for three days, he comes

14  back, he still doesn't know how to do a traffic accident

15  investigation.  That's an error of skill.  So we have to

16  refer him for additional training.

17            Errors of judgment, if an officer shoots when

18  he shouldn't, it still doesn't do any good to discipline

19  him.  He comes back, he still doesn't know when to shoot.

20            Errors of heart, that's wrongdoing

21  intentionally.  That's where discipline is.

22            So to be honest with you I don't recall whether

23  or not I disciplined that particular officer.  He did not

24  have an understanding what probable cause was, so I

25  referred him for additional training.  I'm confident of

78

1   that.

2       Q.   Do you recall ever disciplining an officer for

3   arresting a suspect without probable cause?

4       A.   As I said earlier, I can only recall the one

5   instance where I even had to change a decision by an

6   officer because he didn't have probable cause.

7       Q.   Did you ever discipline a supervisor of an

8   officer who made an arrest without probable cause?

9       A.   No.  I don't recall.

10      Q.   Did you ever institute any policies or

11  procedures once an arrest was made without probable

12  cause?

13      A.   I don't understand that question at all,

14  Mr. Alley.  Did I institute?  Say it again.

15      Q.   In your tenure as a police chief for the four

16  different agencies in which you were a police chief, has

17  there ever been an arrest without probable cause?

18      A.   I said no, not that I'm aware of, except for

19  the one that I did mention to you, and I stepped in and

20  unarrested the individual.

21      Q.   You mean to tell me that in your 14 years at

22  Tallahassee that there hasn't been an arrest made without

23  probable cause?

24      A.   I'm telling you that I was not aware of it.  If

25  there was, I would have stepped in.  An arrest requires

79

1  probable cause to have the authority to make the arrest.

2      Q.   What's your understanding of an arraignment or

3  first appearance in the state of Florida?

4      A.   I don't have an understanding of what

5  arraignment or first appearance of Florida anymore.  I've

6  been away from here for 15 years, 14 years.

7      Q.   Did you have an understanding of an arraignment

8  or first appearance in the state of Florida when you were

9  the chief of police for Tallahassee for 14 years?

10     A.   I assume I did, you know, but as I said I

11 was --

12     Q.   I don't mean to stop your answer.

13     A.   I don't have any answer to that question.

14     Q.   What was your understanding of an arraignment

15 or first appearance when you were the chief of police for

16 Tallahassee?

17     A.   First appearance is typically to determine

18 whether or not a bond is going to be set.  An arraignment

19 is for opportunity for entering a plea.

20     Q.   Do you know if a judge reviews an arraignment

21 or first appearance probable cause?

22     A.   Typically, a review -- I'm trying to see if I

23 can figure out a polite way of doing this, saying this.

24 Typically an assumption is made -- now, that's a

25 unfortune fortunate thing for me to have to say -- that

80

1   the officer's conduct was appropriate, although because I

2   have seen numerous probable cause affidavits filed in

3   which a warrant was issued, and upon hindsight the

4   probable cause affidavit listed nothing but neutral or

5   equivocal facts, and it was determined later there wasn't

6   sufficient probable cause and the case was dropped.

7       Q.   When the case was dropped, did you render

8   any -- did you make any changes to your department?

9       A.   Are we talking about in my department now?

10      Q.   Well, you were just referring to a case.  Is

11  that a case --

12      A.   I'm talking about cases I've reviewed since

13  then as a litigation consultant.

14      Q.   Okay.  Do you know whether if a judge at an

15  arraignment or first appearance feels that probable cause

16  is lacking, whether that judge has to throw the case out

17  at that time?

18      A.   If a judge is looking at a case and feels like

19  there's insufficient probable cause, I think the judge

20  has a responsibility to say, "There's not sufficient

21  probable cause to make an arrest, turn this person

22  loose."

23      Q.   Did your -- when you were the police chief for

24  Tallahassee, did you ever have a case where no probable

25  cause was found at arraignment?

81

1        A.    Not that I'm aware of.

2        Q.    Would you -- if there was, would you have

3    disciplined the officer?

4        A.    It's a hypothetical and that would only be --

5    the only time I discipline an officer is if it was

6    intentional, misleading of the court, putting down facts

7    on probable cause affidavit that were not true or

8    something like that.

9        Q.    And do you recall ever doing that?

10       A.    No.

11       Q.    What's your understanding of forfeiture, civil

12   forfeiture?

13       A.    What's my understanding of civil forfeiture?

14            MS. STEVINS:   Objection.   Relevance.

15   BY MR. ALLEY:

16       Q.    Again, you're laughing.

17       A.    I guess because I truly don't know what that

18   has to do with this case.   Excuse me for chuckling, but I

19   just didn't anticipate being asked about civil

20   forfeiture.

21            MS. STEVINS:   Objection on the grounds of

22       relevance.

23       A.    Answer the question?

24   BY MR. ALLEY:

25       Q.    Please.

82

1       A.    The seizing of a piece of property that may

2   have, for example, been used in an illegal activity, like

3   the use of a motor vehicle to distribute drugs, and the

4   seizure of that by a law enforcement agency and movement

5   civilly to have that property become your own because it

6   was illegally used.

7       Q.    Did you ever have a case where a judge

8   dismissed -- in a civil forfeiture case when you were the

9   chief of Tallahassee, did you have a forfeiture division?

10      A.    I didn't have a forfeiture division.  I don't

11  recall.  I have seized property on occasion from drug

12  dealers and I had an attorney that sought through civil

13  forfeiture procedures to get that property turned over to

14  us, yeah.

15      Q.    Did you ever -- in that process did you ever

16  have a case -- lose a case because there was a lack of

17  probable cause?

18      A.    I don't know.  There may have been.

19      Q.    Did you -- what discipline did you do to the --

20  did you give to the officer?

21      A.    Mr. Alley, I think I've -- I keep trying to

22  answer it for you as long as you ask it, but I did not

23  discipline officers if it was an error of judgment or

24  skill.

25      Q.    Thank you.

83

1          A.   I would send them back for additional training

2     or further education on the concept.

3          Q.   I'm going to ask you some questions about your

4     reports.  And I haven't read the second report, so you're

5     going to have to -- we're just going to have to struggle

6     through that, because I had it handed to me this morning

7     while I was asking you questions.

8               MS. STEVINS:  If you'd like, Mr. Alley, we can

9          take a break.

10              MR. ALLEY:  No, I'd like to move -- I'd like to

11         keep going.  If you want to take a break, a restroom

12         break or something, but I'm not going to take -- I

13         don't want to take a break to read his report and

14         then ask questions.  I have a list of questions here

15         I need to get through.  So I don't want to.

16              MS. STEVINS:  I just want to give you an

17         opportunity to make sure you review the report while

18         he's here.  That way you can ask him any questions

19         that you feel are necessary while we have him here.

20              MR. ALLEY:  We will be deposing him on the

21         report, but we're not going to be doing it this

22         morning.

23              MS. STEVINS:  Okay.  Can I just take a five

24         minute break?

25              MR. ALLEY:  Sure.  Sure.

84

1          (Recess taken from 10:57 to 11:06 a.m.)

2     BY MR. ALLEY:

3          Q.   What I want to do now is ask you some questions

4     specific to the facts that the officers had available to

5     them prior to making -- up to the point of making an

6     arrest.  Can you identify the equivocating facts that

7     Officer Millhorn had prior to Bonita Rosa being arrested

8     related to this domestic violence disturbance?

9          A.   Well, certainly, I think that one was whether

10    or not there was an actual attack with the screwdriver

11    and the knocking out of the hands with the chair by

12    Mr. Santana.  You know, all of that was basically, if you

13    take what the officers knew or were told in responding to

14    the call, as I said in my report, they certainly had

15    reasonable suspicion based on upon that dispatch to

16    conduct investigation as to whether or not there was

17    probable cause to believe there had been a domestic

18    violence incident and most of that was equivocal in

19    nature, equivocal as to whether or not there was even a

20    domestic violence situation, because it doesn't meet the

21    definition of domestic violence as described by the

22    General Orders of the Fort Myers Police Department or the

23    statutory definition for domestic violence in Florida, so

24    it's equivocal right off the bat as to whether or not

25    it's domestic violence.

85

1      Q.   Are there any other equivocating facts that

2   Officer Millhorn had prior to the arrest?  What I'm

3   trying to do is get you to list all the equivocating

4   facts that Millhorn had.  Would it be the same for

5   Millhorn and Reiman in your analysis or would it be -- do

6   we need to go through and say Millhorn and then Reiman?

7      A.   Well, I think they were together there and it

8   would be the same for Reiman and Millhorn.

9      Q.   So right now I'm asking you to identify the

10   equivocating facts that they had.

11      A.   Well, first was whether she had a screwdriver

12   and whether or not she scratched a car with it.  I'd have

13   to look at their incident report as to whether or not

14   they concluded, saw, or reported that the car was

15   scratched.  But that would be an equivocal.  That would

16   be the first.

17           Whether the argument became physical at all or

18   not.  And I'm just -- so you'll know what I'm doing, I'm

19   looking at the narrative report filed by Officer Reiman

20   where he uses -- or Reiman where he uses terms that are

21   equivocal in nature and should have been -- they should

22   have been -- it should have been investigated to

23   determine whether or not this equivocal term was

24   incriminating or exculpatory.  "An argument," what does

25   an argument mean?  It could be just verbal or it could be

86

1  physical and he doesn't describe it.  It's just an

2  argument.

3          He said it started as a verbal, but he doesn't

4  say that it became physical.  He says Ms. Bonita

5  proceeded to pick up a black screwdriver and "began to

6  come after Mr. Santana."  What does that mean, "come

7  after Mr. Santana"?  Did she attack him with it?  What

8  does "come after" mean?  That's very equivocal to me.

9          Is she -- is she -- "Mr. Santana retreated,

10 picked up a green plastic lawn chair in order to protect

11 himself.  Ms. Bonita advanced on Mr. Santana, who swung

12 the chair and knocked the screwdriver from her hands."

13         So I assume he's trying to say there, this is

14 where he became physical.  Again, he doesn't say anything

15 at all about there being any injuries to Mr. Santana,

16 which to meet the domestic violence situation in Florida,

17 it doesn't meet the domestic violence definition.

18         Then it continued as verbal.  So again, it's

19 hard to understand what he's talking about as to whether

20 or not it was all verbal.  And in the final analysis it

21 appears that Reiman by choosing the charge of assault --

22 and it was real confusing to me, because he puts down

23 "DV" beside that, "assault DV," and assault without

24 injury can't be a DV by definition.  So a whole bunch of

25 equivocal stuff here that was just not investigated

87

1    enough.

2          On his report, not only dealing with the

3    incident itself, but at the jail when it is described as

4    Ms. Bonita becoming combative.  Combative is an equivocal

5    term.  What does that mean?  How was the person

6    combative?  What did the person do in detail?

7          Q.   And I don't want to stop you, but I want to get

8    to the point of probable cause here.  I'm asking you and

9    you're giving them to me the equivocating facts that the

10   officers had --

11         A.   Right.

12         Q.   -- up to the point of arrest?

13         A.   Right.

14         Q.   The holding cell, we'll get to that in a

15   minute.  But keep going on identifying the equivocating

16   facts that the officer had and your analysis, Mr. Tucker.

17         A.   Another equivocal fact was the fact that

18   neither of the so-called witnesses, Mr. Ochoa or

19   Mr. Santana, were willing to give written statements.

20   That's equivocal.  The whole idea of having exemptions

21   under the state law to be able to make an arrest, a

22   warrantless arrest when the officer hasn't observed an

23   event is because of the so-called intimidation factor.

24   The person is afraid that they will have to pay for it

25   later.  Or, for example, if it's the woman that's the

88

1   victim, that the husband will stop supporting her and

2   kick her out of the house.

3          No effort made in trying to determine the

4   equivocal issue as to why neither of the two witnesses

5   would provide a statement.  Were they not providing a

6   statement because -- a written statement because these

7   things didn't happen or were they afraid for some reason

8   in terms of intimidation?

9          Any exigent circumstances, when you're making

10  an arrest, not only by -- I think the General Orders of

11  the Fort Myers Police Department says that you ought to

12  consider whether or not there's any harm that could occur

13  that's going to be imminent if you don't make an arrest

14  but -- that's equivocal.  There was nothing articulated

15  that Mr. Santana or Mr. Ochoa or for that matter Ms. Rosa

16  would be harmed if they didn't make an arrest.  That's

17  equivocal.

18      Q.   What's the equivocating facts that you're

19  talking about there?  What is it?  Identify it for me.

20      A.   When you make an arrest -- and I have to look

21  at the General Order here.

22      Q.   I'm looking for the equivocating fact that the

23  officers had.

24      A.   And I was talking about the equivocation as to

25  whether or not Mr. Santana or Mr. Ochoa were not

89

1   providing a statement, and why they weren't providing a

2   statement.  That's an equivocal fact.  The fact that they

3   didn't provide a statement is a statement, just the fact,

4   but it's equivocal because there's no investigation done

5   to determine why they possibly weren't providing a

6   statement.

7            For example, if Mr. Santana said, "I'm not

8   going to provide a statement because she'll shoot me

9   afterwards," that goes to incrimination of domestic

10  violence.  If he says, "I'm not providing a statement

11  because there's nothing happened here.  Just go away.

12  Let us alone.  I'm not intimidated."  That's exculpatory

13  in nature.

14       Q.   Okay.  Is that all of the equivocating facts

15  that the officers had in your analysis, Mr. Tucker?

16       A.   I think so.

17       Q.   Take your time.

18       A.   I think that pretty well covers it.

19       Q.   You've used the term "neutral fact" in some of

20  your written materials.  Are equivocating facts the same

21  as neutral facts?

22       A.   No.

23       Q.   Can you describe -- define what a neutral fact

24  is?

25       A.   Certainly.  Man crossed the street.  Then he

90

1   crossed the street again.  That's a neutral fact.  It has

2   nothing to do with determination of reasonable suspicion

3   or probable cause.

4       Q.   What's the difference in your analysis,

5   Mr. Tucker, between a equivocating fact and a neutral

6   fact?

7       A.   Well, the difference is is an equivocal fact

8   can be investigated and determined one way or the other.

9   It can be determined to be a neutral fact that doesn't

10  mean anything, or it can be investigated and determined

11  to be an incriminating fact, which it does mean

12  something, or it could be investigated and turn out to be

13  an exculpatory fact.  A neutral fact is just a neutral

14  fact.  It was daylight.  That's a neutral fact.  You can

15  investigate that all you want and it's not going to turn

16  out to be other than in daylight.

17      Q.   Did the neutral facts that the officer --

18  Officer Millhorn and Officer Reiman had up to the point

19  of arrest of Bonita Rosa for the domestic violence, did

20  they have anything to do with -- the analysis of the

21  neutral facts that they possessed have anything to do

22  with any of the opinions you've rendered in this case?

23      A.   I would say not.  The way -- I would say no.

24  And if I can explain to you, I will do so if you're

25  interested.  If not, then I won't.  Very simply, if

91

1   you're interested, the way I look at situations like this

2   is, first and foremost, if it's a use of force case, as

3   this was -- is, I look at whether or not there was lawful

4   authority for the officer to have been using force in the

5   first place, that is, lawful authority within his

6   jurisdiction, trying to fulfill a lawful objective, and

7   whether or not it had lawful authority either through

8   reasonable suspicion to detain where you can use force or

9   probable cause to arrest which justifies you to use

10  force.  So I looked at first and foremost whether there

11  was probable cause and concluded there was not.

12      Q.   To render the opinions you've rendered in this

13  case, do you need to know the facts and analyze the facts

14  that Officer Millhorn and Officer Reiman had prior to

15  placing Ms. Rosa under arrest?

16      A.   Should you do a probable cause determination?

17      Q.   To render the opinions that you've rendered in

18  this case.

19      A.   Well, certainly.  Certainly, you have to.

20      Q.   What are the incriminating facts that Officer

21  Millhorn had up to the point of arrest of Bonita Rosa?

22      A.   A dispatch that there had been a domestic

23  violence situation going on, that there had been a threat

24  with a screwdriver.  I was looking for the incident

25  report or dispatch tape.  Threatening is incriminating.

92

1    Screwdriver's incriminating, yes, but it could be

2    equivocal.  You don't know whether she was using the

3    screwdriver right off to defend herself against him or to

4    attack him is equivocal.

5        Q.   What I'm asking you -- and feel free to use any

6    of the reports or any of the documents you need to

7    review, but what are the incriminating facts that Officer

8    Millhorn had up to the point of the arrest of Bonita

9    Rosa?

10       A.   Well, Mr. Alley, I guess another explanation is

11   necessary.  All officers do not have the same powers of

12   determination of probable cause.  And specifically, what

13   I'm saying and I'll give you an example, you can't just

14   take the facts by themselves and say this gives probable

15   cause or not.

16            If you had an officer who just got out of the

17   academy and had never worked narcotics and did not know

18   where narcotics was sold in the community where he was

19   policing and didn't have any knowledge about how crack

20   cocaine was used, for example, smoked, if that officer

21   goes out on routine patrol and drives by and sees a man

22   standing on a street corner with a Coca Cola can bent in

23   half and a Bic lighter in his right hand, that does not

24   cause that officer to have reasonable suspicion or

25   probable cause to believe a crime was being committed.

93

1    However, if an officer has worked narcotics and

2  knows that crack cocaine can be smoked by bending a Coke

3  can in half with a hole in it, putting the crack cocaine

4  on it and heating it with a Bic lighter, and also knows

5  that that particular area is where crack cocaine is sold

6  and used, that would create for that officer probable

7  cause to believe a crime was being committed.

8    That's why the definition of probable cause, as

9  I describe it, is dependent upon the totality of the

10  circumstances and facts known to the officer and

11  considered against the backdrop of that officer's

12  knowledge, training, and experience that would lead that

13  officer to reasonably believe a crime had been committed,

14  was being committed, or is about to be committed.  So

15  everybody has different powers.

16    Q.   What are the incriminating facts that Officer

17  Millhorn had and was aware of at the time up to leading

18  to Bonita Rosa's arrest?

19    A.   Well, we really don't know, except other than

20  what they were dispatched on, Millhorn and Reiman,

21  because neither of them put or Reiman did not put in his

22  report specifically what was told to him or Millhorn

23  orally.  They just put in there that the two witnesses

24  refused to provide a written statement.

25    Q.   Do you know what the facts that -- the

94

1  incriminating facts Officer Reiman had up to the point of

2  the arrest of Bonita Rosa in your analysis in this case,

3  Mr. Tucker?

4      A.   Nothing other than what he put in his offense

5  incident report, so I would assume that he's the one that

6  made the probable cause determination based upon his --

7  him being the one that signed the offense incident

8  report.

9      Q.   Earlier --

10     A.   And again, he says there's an argument.  It was

11  verbal.  Then he says a chair was used in self defense.

12  He doesn't say anywhere that I've seen or read this

13  report over and over and over again about any observed

14  injuries on the part -- on Mr. Santana, who was

15  supposedly the victim of domestic violence.  And by

16  definition under state statute in Florida to be a

17  domestic violence situation, there has got to have an

18  injury involved.  As I say in my report, what he charged

19  with is not one of those offenses that's exempted under

20  901.15 for a warrantless arrest.

21     Q.   Earlier in your testimony -- I want to go off

22  on a little tangent about the arresting officer and the

23  officer who made the determination of probable cause and

24  how you relied -- how you discussed Officer Reiman as

25  being the officer that signed the report.  Earlier you

95

1   testified how you made arrests, but you didn't put your

2   name down on the report, you allowed someone else to put

3   their name on your report because you didn't want to go

4   to court.  Is that what you're referring to here about

5   Officer Reiman's name being on the report?

6       A.   No, it's not.  What I'm referring to here is

7   that Reiman was at the time a trainee under Millhorn.  As

8   I recall the facts of the case, Millhorn was an FDO,

9   field training officer.  So I would surmise from that

10  relationship that Millhorn had him filling out the report

11  and it was collective, in terms of the effort here is

12  collective knowledge kind of a thing.

13      Q.   Are there any other incriminating facts that

14  you've used in your analysis in rendering any and all

15  opinions in this case that you have that you use in your

16  analysis that Officer Reiman had or Officer Millhorn had?

17      A.   No.  And, you know, if I happen to have missed

18  anything in my review here, let me just say that if you

19  have a situation where there's one clear exculpatory, and

20  that is no injury articulated, then you can't charge a

21  domestic violence statute, because you weren't present

22  and didn't observe the events.  It was a misdemeanor

23  offense.  And if it's not a domestic violence situation

24  and with an injury, it's not an exemption under 901.15

25  Florida law in 2004 to be able to arrest without a

96

1   warrant.

2         So it's two-pronged.  One, because there's an

3   issue of probable cause, yes.  But there's also an issue

4   of whether or not you can charge a person when you

5   weren't present and did not observe the activities, that

6   is, a warrantless arrest for a misdemeanor, that is not

7   authorized by Florida law, and it wasn't authorized by

8   Florida law in 2004.

9      Q.   So are there any -- am I understanding you

10  correct to say that, because that you didn't have to look

11  at the incriminating facts that the officers knew at the

12  time and prior to placing Bonita Rosa under arrest, that

13  you didn't need to look at those incriminating facts

14  because of the overriding evidence, or did I --

15  overriding evidence regarding lack of injury, or can you

16  please -- please explain that better?

17         Because you issued a report.  You needed to

18  know -- on probable cause you needed to know the facts

19  that the officers had to make a determination on whether

20  they had probable cause or not.  And I'm asking you about

21  those facts.  You've already -- you've already identified

22  the -- what your in mind, Mr. Tucker, are the

23  equivocating facts that went into your opinions.  Now,

24  I'm asking you, what are the incriminating facts that the

25  officers had and your analysis in rendering your opinions

97

1   in this case when Bonita Rosa got arrested?

2       A.   All right.  Mr. Alley, as I pointed out in my

3   report and as training key number 136 I believe is the

4   one I cited, probable cause is a balance sheet process.

5   The officer gathers incriminating information.  The

6   officer gathers exculpatory information.  He does not

7   consider neutral facts.  He investigates more thoroughly

8   equivocal facts to determine whether equivocal facts are

9   incriminating or exculpatory in nature.  He considers on

10  a balance sheet process the incriminating versus the

11  exculpatory facts and makes a decision as to whether or

12  not there's a level of proof that would support the

13  probable cause to believe that a crime had been committed

14  or was being committed.

15      Q.   And you have done that in this case?

16      A.   And I've done that, and what I said is --

17      Q.   And what were the facts that the officers had?

18      A.   What I have said is, when you do the balance

19  sheet process in this case, because there's no

20  articulation of any kind of an injury on the part of any

21  parties involved here, that means that this incident did

22  not meet the definition of domestic violence in Florida

23  as it existed in the General Orders of the Fort Myers

24  Police Department at the time of this incident and as it

25  existed by definition under the Florida state law at that

1  time, so you can't charge somebody if you have the lack

2  of the incriminating evidence, which is an injury.

3          You can't -- as he put down here, he, in the

4  incident report, 784.011 and puts a DV parentheses means

5  nothing.  If it's not a DV, it's not a DV.  If it's not

6  domestic violence, it's not domestic violence.  The

7  definition of domestic violence was that an injury was

8  obvious and evident by definition of state law at the

9  time and by General Orders.

10      Q.   In your analysis, Mr. Tucker, if the facts, the

11 incriminating facts and the balance test that you apply

12 point to the commission of a crime, whether it's a crime

13 that the officer charges an individual with or otherwise,

14 if it points to the commission of a crime, is that

15 relevant in your analysis on whether probable cause

16 exists?

17      A.   If I understand what you just asked, it is --

18      Q.   Would you like me to repeat it?

19      A.   Let me see if I can try to answer what you're

20 saying.  If -- you better ask the question again, because

21 I'm not sure that it made sense for me.

22      Q.   You've talked about how the lack of the injury

23 is the -- not being in a report is the evidence that is

24 overwhelming over all the incriminating evidence that the

25 officers had; is that correct?

99

1        A.    To meet the requirement of being a domestic

2    violence act in Florida in 2004, which then gives you the

3    authority to arrest without a warrant and without having

4    observed the activities.  If you don't have that,

5    Mr. Alley, what I'm saying so that it's perfectly clear,

6    if you don't articulate that there was an injury, then it

7    doesn't meet the definition of domestic violence as it

8    was in Florida on the date of this incident and as it was

9    defined by the General Orders of the Fort Myers Police

10   Department on the date of that incident; so therefore,

11   it's not domestic violence; therefore, you can't arrest,

12   because therefore it's not exempt under 901.15 to be one

13   of those cases where you can arrest without a warrant or

14   without having observed the events.  I don't know any way

15   clearer that I can say it than that.

16       Q.    Are there any other incriminating facts that

17   the officers had -- you've had a chance now to read all

18   their deposition testimony; is that correct?

19       A.    Yes.  Yes.

20       Q.    Are there any other incriminating facts that

21   they had in their possession that you used in your

22   analysis in rendering your opinions in this case?

23       A.    No, not that I recall.

24       Q.    And does the same apply for Officer Millhorn

25   and Reiman?

100

1    A.   Yes.

2    Q.   What was the exculpatory -- what were the

3 exculpatory facts that you used in the balancing tests on

4 a finding of probable cause in rendering your opinions in

5 this case that Officer Millhorn and Officer Reiman had up

6 to the point of arrest?

7    A.   No articulation of any injuries is the primary

8 exculpatory fact, which meant that there was not probable

9 cause to the level of proof to support a domestic

10 violence charge.

11    Q.   Are there any other exculpatory facts that

12 Officer Millhorn and Officer Reiman had in your analysis

13 in rendering your opinions in this case or don't those

14 facts matter because of the primary fact you just

15 referred to?

16    A.   Well, I don't think they matter, but I can't

17 make the determination, because I already told you that

18 the most important fact was that there was no injury,

19 which means it didn't meet the DV requirement.  But I

20 can't answer your question because most of the facts were

21 equivocal and there wasn't a sufficient preliminary

22 investigation conducted by Millhorn and Reiman to

23 determine whether those equivocal facts were

24 incriminating or exculpatory in nature.

25    Q.   Well, you can't answer my question on what the

101

1  facts were that they had on their determination of

2  probable cause?  Didn't you sit in judge -- aren't you

3  sitting in judgment on whether they had probable cause or

4  not in making this arrest?

5      A.   Am I sitting in judgment as to --

6      Q.   Aren't you rendering an opinion on whether they

7  had probable cause or not to make the arrest?

8      A.   I'm rendering and have rendered opinions in

9  this case, and my opinions are that there was not

10  probable cause to make an arrest on a DV statute, because

11  Mr. Reiman and Mr. Millhorn -- Officers Millhorn and

12  Reiman did not observe any of the events that occurred

13  there.  So since they didn't observe, they had to have a

14  warrant for her arrest or his -- anybody's arrest or they

15  had to be exempt under state law to make a warrantless

16  arrest, and they didn't have that exemption, because they

17  didn't articulate any injuries.

18      Q.   The facts -- but I want to get back to the

19  point on you can't answer my question.  The facts that

20  Officer Reiman and Officer Millhorn had up to the point

21  of Bonita Rosa's arrest, the facts that they had, can you

22  identify for this jury what those facts were?

23           That's my question.  You need to know what the

24  facts they had were and I'm asking -- you've already done

25  it for a lot of it, but you said you can't answer my