102

1    question.  I'm asking you -- you needed the facts for the

2    balancing test to sit in judgment on whether they had

3    probable cause or not, and I'm asking you what those

4    facts were.  Why can't you answer that?

5        A.   I think I've already answered it a half dozen

6    times, but I'll continue to try to answer it again for

7    you.

8        Q.   So you can answer it?

9        A.   I'm fully capable of answering the questions

10   regarding probable cause.  Let me start with this.

11   Number one, contrary again to your expert -- and I

12   apologize for this ahead of time.  I have had, like I

13   said, 350 to 400 cases and I've never criticized opposing

14   experts.

15       Q.   I'm not talking about my --

16       A.   However, in this case your expert rendered an

17   opinion that probable cause was a probability analysis

18   more likely than not, 51 percent.  In fact, the law is

19   not that at all.  It's only a fair probability, so --

20       Q.   Move to strike as unresponsive.

21            I'm not asking you about -- we can talk about

22   his opinion later.  I'm asking you, you said you can't

23   answer my question.  Can you answer my question or not?

24       A.   Is your question, what facts did they have?

25   You have asked it and I have answered.

103

1       Q.   Okay.  Then you can answer the question?

2       A.   Say the question again one more time and I'll

3  just answer it for you and we'll move on.

4       Q.   What are the facts, the exculpatory facts --

5       A.   Exculpatory.

6       Q.   -- that Officer Millhorn and Officer Reiman had

7  up to the point of the arrest of Bonita Rosa?

8       A.   No injuries.  No injuries were articulated at

9  all to show injury in the report narrative by -- filed by

10 Officer Reiman and that is required to meet the

11 definition of domestic violence in Florida.

12      Q.   In your analysis, Mr. Tucker, does it matter

13 whether it's Officer -- the facts Officer Millhorn had

14 versus the facts Officer Reiman had or are they

15 collective?

16      A.   Probable cause can be a collective knowledge

17 situation, so it doesn't make any difference.  If Officer

18 Millhorn saw something or learned something that Officer

19 Reiman did not see, but Officer Millhorn told him about

20 it, that's called the collective knowledge doctrine and

21 can be used for determination of probable cause.

22      Q.   In forming your opinions is it an approved

23 methodology to speculate?

24      A.   Is it approved?  No.

25      Q.   In forming your opinions is an approved

104

1   methodology to be dishonest or deceitful?

2       A.   No.  I'm sorry, that's not.

3       Q.   In forming your opinion -- I'm sorry, why were

4   you apologizing?

5       A.   I just said, no, it's not.

6       Q.   In forming your opinions is an approved

7   methodology to assume facts not in the record?

8       A.   No.

9       Q.   Have you ever -- have you ever done that in

10  forming your opinions, either speculate, be dishonest or

11  deceitful, or assume facts not in the record?

12      A.   No, I haven't, unless I've been asked to render

13  opinions on a hypothetical, which would be a speculation.

14      Q.   Has a judge ever ordered that you did do any of

15  those things --

16      A.   No.

17      Q.   -- speculate, be dishonest, deceitful, or

18  assume facts not in the record in any of your testimony

19  you've given as a litigation consultant?

20      A.   No.

21      Q.   Can you describe the process of a proper

22  reporting procedure?  Do you want me to elaborate a

23  little bit?

24      A.   Yeah, please.

25      Q.   If we were to issue a report -- if I were to

105

1   write down a report of this deposition today on a piece

2   of paper, on two pieces of paper, there's an infinite

3   number of things that are going on.  The report is only

4   going to contain a specific what I put on the report,

5   what I put on those two pages, because if it were to

6   contain the infinite number of things going on, the

7   report would be an infinitely long report.

8        A.   Right.

9        Q.   What I want to do is, I want to talk about the

10  reporting procedure when a police officer in Florida, the

11  proper reporting procedure.  That's this line of

12  questioning that I'm going on.

13       A.   Okay.

14       Q.   And then just so -- I don't want to pull any

15  punches here.  The next question after I do this is, I'm

16  going to ask you, if a police officer is aware of

17  something but it's not in their report, are they lawfully

18  obligated to consider that or are they lawfully obligated

19  to not consider it?  And that's the second question.  But

20  first, I want to get from you, what your -- I want to get

21  your understanding and your analysis of a proper

22  reporting procedure for a patrol officer.

23       A.   Proper reporting is reporting what --

24  accurately what happened, reporting completely what you

25  thought happened, as concisely as you can.  And I think

106

1   those are the three things that are generally talked

2   about in the report training curricula:  Accurately,

3   complete, and concise.

4           When you report, for example, factual

5   information regarding probable cause or reasonable

6   suspicion, the only thing that you can go on when you're

7   doing an analysis is those things that the person

8   articulated in their report.  And officers are trained

9   when they are writing their report and they are getting

10  ready to make an arrest, that they ought to articulate

11  those grounds that they observed or learned of that

12  justified or that supports their determination of

13  probable cause to make an arrest.  What they think of

14  later when they are being deposed doesn't matter.  What

15  they knew at the time and articulated in their report is

16  what mattered and what matters.

17      Q.   Okay.  You testified earlier about how you

18  wouldn't put your name on a report as the arresting

19  officer because you didn't want to go to court.  So there

20  would be facts that you knew that wouldn't be on the

21  report, like your name, that wouldn't be on the report,

22  but those facts in applying -- in applying the decision

23  to arrest, you have to consider nose facts that you

24  observed; is that not true?

25      A.   I think if I --

107

1          Q.   As a law enforcement officer?

2          A.   I think, if I understand, the question was:  Do

3    you have to consider those facts that you observed when

4    you're making an arrest?  Yes.

5          Q.   Now, if an officer does not place information

6    in their report, but they observed the evidence, the fact

7    that the evidence is not in the report, what impact does

8    that have?

9          A.   It doesn't support probable cause when the --

10   that would be like saying, I'm going to go apply for a

11   warrant and I'm going to put down this person committed

12   robbery and hand it to the magistrate and say, "'here, I

13   have all this information on my head that I observed, but

14   I don't have to write it down.  Just give me a warrant."

15              That doesn't cut it.  The fact of the matter

16   is, when you apply for a warrant, you've got to

17   articulate those facts and circumstances considered in

18   their totality against the backdrop of that officer's

19   training, knowledge, and experience that would lead that

20   officer to believe a crime had been committed or you

21   can't get a warrant.

22         Q.   Okay.  And I have asked questions about other

23   things.  I'm not asking questions about warrants and

24   warrant cases, because this case doesn't have a warrant.

25         A.   That's right.

1     Q.   It's a warrantless arrest case.  And I'm asking

2   you -- I'm going to ask the question again.  If an

3   officer doesn't place information in the report, but they

4   observed the evidence, the fact that the evidence is not

5   noted in the report has what impact?

6     A.   It has the impact of not being probable cause,

7   that is, what -- it's like -- an officer can't come up

8   with ideas ten days later that he expresses was the

9   probable cause for making an arrest ten days earlier.  He

10  needs to articulate what he knew or learned of or

11  observed that gave him the probable cause to make the

12  arrest on the date of the incident or at the time of the

13  incident, what he knew or observed or learned.

14    Q.   But that's again -- I'm not asking about what

15  the officer thinks about ten days later.  That wasn't my

16  question.  I'll read the question again just because I'd

17  like to get your answer and your analysis.

18         If an officer does not place information in

19  their report but observes the evidence, the fact that the

20  evidence is not noted in the report has what impact?

21    A.   It has the impact of not supporting probable

22  cause to make an arrest or a reasonable suspicion to make

23  a detention.

24    Q.   Thank you.

25    A.   And if what was in that officer's mind is never

109

1  written down, nobody is going to know.

2      Q.   Can a police officer lawfully disregard an

3  observed known fact or piece of evidence simply because

4  the police officer did not place that fact or known piece

5  of evidence in their report or collect that piece of

6  evidence?  Do you understand the question?

7      A.   No, I don't.

8      Q.   Okay.  Let me clarify it a little bit.

9      A.   Okay.

10     Q.   If you observed something --

11     A.   Right.

12     Q.   -- and you're a police officer and you observed

13  something and you don't put it in your report --

14     A.   Right.

15     Q.   -- can you disregard what you observed in

16  making a determination of probable cause lawfully?

17     A.   I guess it depends on what you observed.  If

18  you observed that the sky was blue and the sun was out

19  and the temperature was 76 and you didn't put that in

20  your report, so what?  That's not relevant to the

21  probable cause determination.

22          If you observed something that was exculpatory

23  or incriminating, you have an obligation to put it in

24  your probable cause determination, write it down know,

25  articulate it.

110

1     Q.   What if you don't put it in your report?  What

2  if it's not in your report?  Do you still have an

3  obligation -- can you disregard it or do you have an

4  obligation to consider it?

5     A.   I don't know what you mean by disregard.  If

6  I'm looking -- Mr. Alley, I don't understand a thing that

7  you just asked me to be honest with you.  I'm sorry, but

8  it doesn't make any sense to me at all.

9     Q.   No.  Please when I ask a question you don't

10  understand, I want you to do exactly what you've been

11  doing the whole deposition, because I want your

12  thoughtful answers.

13         Can a police officer that observes something

14  and they don't put it in their report that they observed

15  something that's relevant to a determination of probable

16  cause, not whether the sky is blue, but it's --

17     A.   Okay.  Incriminating or exculpatory

18  information.

19     Q.   Yeah, they observed something --

20     A.   One or the other.

21     Q.   -- that's relevant to the determination of

22  probable cause, but it's not -- they don't put it in

23  their report --

24     A.   Right.

25     Q.   -- can that police officer lawfully disregard

111

1   that because it's not in their report, or must they

2   consider that evidence as the case moves forward?

3       A.   They are obligated to consider the evidence.

4   They need to articulate what the evidence is in their

5   report so people, when they're reviewing it, as we're

6   doing now, know what they knew at the time they made the

7   decision to make the arrest and not what they came up

8   with six months later.  That's simple as that .

9       Q.   But when you say "they came up with six months

10  later," there you're speculating?

11      A.   I don't know that I'm speculating.

12      Q.   Well, who came up with something six months

13  later?

14      A.   I just used that as an example.  I'm not saying

15  that happened here.  I'm saying, as a matter of fact if

16  you don't articulate it there, you can't six months

17  later -- I'm not saying it happened here.  I'm using that

18  as an example.

19      Q.   Have you ever left anything out of a report

20  that you should have put in a report?

21      A.   Have I ever -- I don't know.  If it's -- are

22  you talking about a probable cause affidavit or are you

23  talking about an investigative report?  It depends.

24      Q.   Any law enforcement report that was used for --

25  that was used for the prosecution of a citizen being

112

1 charged with a crime.

2     A.   Any law enforcement report I ever filed, I

3 tried to make sure it was accurate and complete.

4     Q.   And if you left something out but it was

5 relevant to the criminal prosecution, it's my simple

6 question, can you lawfully disregard it, or do you have

7 to consider it, whether you put it in your report or not?

8     A.   I don't know what means "lawfully disregard".

9 I don't have the slightest idea what that means.  You

10 mean, if I disregard it, am I going to be charged with a

11 crime?

12         If you know something that is incriminating or

13 exculpatory, you have an obligation to articulate that in

14 your report, so that you can -- when somebody is looking

15 at that to determine whether or not you have reasonable

16 suspicion to detain or probable cause to arrest, they can

17 make that determination.  That's all I can tell you.

18 Now, whether somebody disregards something, I don't have

19 any idea what you're talking about to be frank with you.

20     Q.   Well, what I'm talking about is this, is that

21 if you have a piece of evidence, and at the time you make

22 your report, you didn't feel it was important, you didn't

23 put it in your report, but you observed that evidence,

24 you're not making it up, you observed it, you saw what

25 happened and you're aware of it --

113

1    A.    Right.

2    Q.    -- and it becomes relevant at some point in

3  time in the future, either a question by a court or a

4  question by a lawyer or something like that, and you know

5  the answer from your observations and from what you've

6  observed, no -- are you obligated to reveal that evidence

7  and information that you observed?

8    A.    Sure.   Sure.

9    Q.    The next question is:   Can you lawfully

10  disregard it saying, "it's not in my report"?

11    A.    If you learn at any point of exculpatory

12  information or incriminating information that you didn't

13  know about at the time when you made some kind of a

14  decision, you have a responsibility to divulge that just

15  like the district attorney does under the Brady Rule on

16  exculpatory information being provided to defendants.  Of

17  course.  If that's what the question is.

18         MR. ALLEY:  Thank you.  Can we take a two

19      minute break?

20         MS. STEVINS:  Sure.

21         MR. BURANDT:  I'm ready to go.  I don't need

22      it.  Do you want to --

23         MR. ALLEY:  No, that's all right.  Let's go.

24      Go ahead.

25                        EXAMINATION

114

1   BY MR. BURANDT:

2       Q.   My name is Bob Burandt. I represent the

3   officers individually, so I'm going to be asking you some

4   questions. I'm going to apologize in advance, but I just

5   need to figure out the parameters.

6            I think I've got a good idea of your

7   background. Your credentials are impressive, I must

8   admit. But I do need to ask you some questions real

9   quick.

10      A.   Sure.

11      Q.   Some things have changed in time. I assume the

12  academy you referred to is the FBI Academy?

13      A.   I don't know. What -- when did I --

14      Q.   You said something about you went to the

15  academy.

16      A.   Oh, yeah, the FBI Academy.

17      Q.   Have you been to any other academies?

18      A.   I don't think I've had -- what? You're talking

19  about basic law enforcement academy?

20      Q.   Right.

21      A.   No, I did comparative compliance with meeting

22  the requirements. All I had to do was study, take a test

23  on law.

24      Q.   Now, your opinion is -- and I'm going to try

25  and describe this. This is going to be a confusing

115

1  question.  But like colleges, there's different schools

2  of college.  For example, there's the college of science.

3      A.   Right.

4      Q.   And the college of art.

5      A.   Right.

6      Q.   Would you consider your testimony to be one of

7  science or to be one of art?

8      A.   I would consider it to be neither.  I would

9  consider it to be based upon the law, number one.

10  Granted, I guess, there can be differences as to an

11  opinion as to whether or not probable cause existed or

12  not depending on who is making the interpretation.

13  That's where why there are court decisions.

14      Q.   Okay.  So it's not a testimony based on any

15  sciences?  You didn't rely on any economic principles,

16  accounting standards, engineering standards, property

17  valuation or any other?

18      A.   No.

19      Q.   So everything you've done is basically an

20  opinion that can be differentiated by different people.

21  Somebody can see the same thing and have two different

22  opinions, as opposed to mixing two chemicals together and

23  having a third chemical.

24      A.   In terms of Daubert, this is not science.  My

25  opinions here are based upon what I said, my training, my

116

1  knowledge, my experience in law enforcement, my review of

2  literature, my review of the facts of the case.  And my

3  opinions are designed to assist the trier of fact in

4  understanding the evidence before the trier of fact, the

5  jury.  And that's why I support the opinions that I

6  did -- that I gave the way I did, with the protocols that

7  are recognized in the law enforcement profession.

8      Q.   So you came to certain conclusions based on

9  your review of the documents?

10     A.   I came to conclusions that were not through the

11 assignment of credibility of witnesses, but through the

12 assumption of facts to be true for purposes of analysis,

13 and that's what experts are supposed to do.

14     Q.   And again, you didn't do any kind of testing?

15     A.   There was no -- no.

16     Q.   You didn't test any of the parties.  Have you

17 even talked to the Plaintiff or any of the other

18 witnesses?

19     A.   I have not talked to anybody other than

20 Ms. Stevins.

21     Q.   And you have reviewed those documents?  Okay.

22          Now, you said you've read David Grossi's

23 report.  For the record, who is David Grossi?

24     A.   David M. Grossi is the defense expert in this

25 case.

117

1      Q.   Do you know him personally?

2      A.   You know, I don't know that I have met him

3 personally, but he has been on cases in which I've been

4 involved and I've seen some of his reports.

5      Q.   Were any part of your conclusions based on

6 anything that he reported?

7      A.   My opinions were not based on what he reported

8 in his reports.  My opinions are contrary to his and in

9 complete disagreement with his analysis.  He did an

10 analysis of use of force using the continuum and that's

11 not the way it's done.  He made an interpretation of

12 probable cause, which is flat out wrong.

13      Q.   Explain that to me.  His interpretation of

14 probable cause is based on what?

15      A.   Okay.  In his deposition -- can I refer to it?

16      Q.   You can if you want, but I'm just looking for

17 an overall.

18      A.   Okay.  Overall, when he was asked about

19 probable cause, he said it's a matter of probability,

20 more likely than not, 51 percent.  I don't have that in

21 front of me right now as to what his cite is.  But, you

22 know, I've studied this issue a lot over the years, and I

23 know that that is not the case at all.  And in fact, the

24 legal cite, I guess it's Illinois versus Gates -- yeah,

25 it is -- 462 U.S. 213 clearly says it's the fair

118

1   probability.   It's not more likely than not, just a fair

2   probability.   It's actually a lower standard than what he

3   describes.

4        Q.   Where a crime has been committed, is being

5   committed, or is about to be committed and it's probable

6   that that person committed the crime.   Would you agree

7   with that definition?

8        A.   No.

9        Q.   Give me a two sentence definition.

10       A.   I'll give you my definition, which I think is a

11   little bit better than that one.   It's an event or series

12   of events observed by the officer, if not observed by the

13   officer, an event or series of facts and circumstances

14   relayed to the officer in which the officer can have

15   reliability attached to, which is what I'm talking about

16   here is collective knowledge doctrine, considered in

17   totality -- all of the facts considered in totality

18   against a backdrop of the officer's knowledge, training,

19   and experience, because each officer has different powers

20   based upon their knowledge, training, and experience

21   which would lead that officer to reasonably believe, if

22   we're talking about probable cause, that a crime had been

23   committed, was being committed, or was about to be

24   committed.   And reasonable suspicion would be exactly the

25   same thing, except a lower level of proof, and it would

119

1  be to reasonably suspect that a crime was being

2  committed, had been committed, or was about to be

3  committed.

4      Q.   Did you rely on any other experts in forming

5  your opinion?

6      A.   No.

7      Q.   Did you confer with any other experts in

8  forming your opinion?

9      A.   No.

10     Q.   Did you do any independent research regarding

11  this case?

12     A.   No.

13     Q.   If so, with whom?

14     A.   No.

15     Q.   And I guess your references would be the cases

16  that you've been citing as we sit here today?

17     A.   Are you talking about references for use of

18  force?

19     Q.   Yes.

20     A.   Yeah, Graham v. Connor, Tennessee v. Garner.

21     Q.   You didn't tell Grant why you left Morristown,

22  Tennessee and went to -- was it Asheville?

23     A.   Right.  No, I went from Morristown, Tennessee

24  in 1974 to double the size of my department, which

25  basically I did throughout my career.  From Hickory,

120

1  after I finished my Master's degree, I went to Asheville,

2  doubled the size of my department, from Asheville to

3  Tallahassee, doubled the size of the department.

4      Q.   So these were all voluntary terminations?

5      A.   Yes, they were -- they were all voluntary.

6      Q.   Okay.  Have you ever sued anyone or be sued by

7  anyone?

8      A.   I've never sued anyone.  Have I been sued?

9  Yeah, numerous times as a police chief -- in my capacity

10 as a police chief.

11     Q.   Ever been sued individually?

12     A.   No.

13     Q.   I assume when you say you chased this guy down

14 in Tallahassee and relying on radio transmission for

15 description of the armed robber --

16     A.   Correct.

17     Q.   I assume then you agree the police officers can

18 use radio transmissions in their probable cause analysis?

19     A.   Certainly.  Collective knowledge doctrine.

20     Q.   Now, you said you -- have you ever taught at

21 any academy or any colleges?

22     A.   Have I ever taught at any colleges or

23 academies?  Certainly.  I've taught at --

24     Q.   Just answer yes or no.

25     A.   All on my C.V.

121

1      Q.   Okay.  How tall is Officer Reiman?

2      A.   I don't know.

3      Q.   Do you know how much he weighs?

4      A.   Those questions were asked in the depositions,

5  but I don't recall at this point.

6      Q.   Are they in your analysis?  Were they used to

7  determine your analysis?

8      A.   No.

9      Q.   How about Millhorn, was Millhorn's height or

10  weight used in your analysis of probable cause or use of

11  force?

12      A.   I'll answer the question simply by saying no,

13  because any force used when the arrest itself is improper

14  is by definition improper source, illegal force,

15  unreasonable force.

16      Q.   Let me see if we agree on one thing.  I think

17  there's three aspects to this case.  Number one was the

18  arrest and whether or not there's probable cause, the

19  second is the reasonable use of force by Millhorn, and

20  then the third would be use policies and procedures.  Do

21  you agree with that?

22      A.   No.

23      Q.   What do you think?

24      A.   I believe there was more than just whether

25  there was probable cause.  The issue is not just probable

122

1  cause.  The issue is whether or not there was the

2  authority to arrest on a warrantless basis, when you

3  didn't observe the events, when there's no exemption

4  under the law to do that.

5      Q.  Okay.

6      A.  Then the second question becomes:  Even if

7  there was an exemption to do it, was there probable

8  cause?  The third issue is:  If there wasn't probable

9  cause, force wouldn't have been justified, or if there

10 was probable cause and we assume there was, then would

11 this level of force have been justified under Graham v.

12 Connor, not any continuums, that's objective

13 reasonableness test.

14     Q.  What level of force are you referring to, the

15 arrest or are you referring to the force used to --

16     A.  There wasn't force used in the arrest.

17     Q.  Sure, there was force used in the arrest.  They

18 had to handcuff her.  They had to put her in the car.

19     A.  Mr. Burandt, you know as well as I do, that

20 handcuffing is not something that's considered a use of

21 force by law enforcement officers.  Otherwise, they would

22 have been required to file a use of force report saying

23 that they handcuffed.  The use of force only as far as

24 lawfulness concerned was the use of force by Millhorn

25 against Bonita Rosa at the jail.

123

1        Q.   So your analysis is not directed at any

2   excessive use of force during the time of the arrest?

3        A.   That's correct.

4        Q.   Okay.  Now, you keep saying the definition as

5   it was and the policies and procedures are the state's

6   statutes on domestic violence.  What definition are you

7   referring to?

8        A.   Okay.  Let me get them from two places.

9        Q.   I'm only concerned with the statute that you

10   relied on.

11        A.   I'm going to give you the statute and the place

12   that it is in the General Orders of the Fort Myers Police

13   Department.  And here they are.

14             Definitions as used in this General Order --

15   I'm reading Domestic Violence Investigation, General

16   Order 30.25.  "30.25.2 Definitions.  As used in this

17   General Order, the following terms mean:  A, domestic

18   violence.  Any assault, battery, sexual assault, sexual

19   battery, or any criminal offense resulting in physical

20   injury or death of one family or household member by

21   another."

22             So that is the definition of the Fort Myers

23   Police Department.  And I'm saying, since there was no

24   articulation of any injuries in the officer's report

25   filed by Reiman, under the training supervision of

124

1   Millhorn, that it does not meet the domestic violence

2   definition.

3          MR. ALLEY:  Can I look -- do you have the

4       City's Number 3, Tucker's Report Number 2, your

5       report that we have marked, Mr. Tucker?  I'd like to

6       read it while you're asking the questions.  That's

7       all.

8          MR. BURANDT:  I think I have it here.

9          MR. ALLEY:  I didn't mean to interrupt, but

10      just while you're asking the questions.  Thank you.

11         THE WITNESS:  Now, you want me to continue?

12  BY MR. BURANDT:

13      Q.   No, I just wanted you to go back.  I've got the

14  definition of 741.28.  Do you have that there?

15      A.   Well, I'm getting ready to refer to 741.28.

16      Q.   Okay.  You're reading that where it says:

17  "Domestic violence means any assault, battery, aggravated

18  battery, sexual assault, sexual battery stalking,

19  aggravated stalking, kidnapping, false imprisonment, or

20  any criminal offense resulting in physical injury or

21  death of one of the family members," et cetera.

22          Your reading that as a requirement that if

23  there's a domestic violence battery, that there must be

24  an injury?

25      A.   What I am reading is --

125

1    Q.    Sir, that only calls for a yes or no answer.  I
2    don't read that the same way.

3    A.    Say it again.  Where are you reading from?

4    Q.    You're reading 741.28 is requiring that an
5    officer has to observe the battery or there has to be an
6    injury before he can arrest for domestic violence
7    battery?  Is that your understanding?  Is that your
8    testimony?

9    A.    My testimony is that it can't meet the
10   definition of 741.28, that is, the definition of domestic
11   violence in the state of Florida in 2004, if there was
12   not an outlined offense that resulted in some kind of a
13   physical injury, yes.

14   Q.    Okay.

15   A.    And I am also saying that the General Order of
16   the department in 2004, 30.25 entitled Domestic Violence
17   Investigations gives the same definition, says,
18   "resulting in physical injury" and without the
19   articulation of physical injury --

20   Q.    Wait a minute.  Let me stop you there.

21        Without the articulation, all I want to know
22   is, your reading of this requires that there be physical
23   injury before an officer can arrest for domestic violence
24   not committed in his presence; is that your testimony?

25   A.    No.  I didn't say before he can arrest.  I said

126

1  that's the definition of domestic violence in Florida.

2  Whether the arrest is made is a separate factor.  I think

3  if I understand your question, you want to know if I

4  interpret 741.28, the definition of domestic violence in

5  Florida, to require an injury; and the answer to that is

6  yes.

7      Q.   That's what I'm asking.  If you're wrong on

8  that issue, if it doesn't require an injury, then they

9  would have arrested for probable cause?

10     A.   No.  That's why I -- when you asked me the

11 factors in this case, the first factor as I see it is

12 that if 741.28 requires injury, then they didn't

13 articulate the injury, so therefore, it wasn't domestic

14 violence.

15     Q.   Wait a minute.  So if they don't put it in

16 their report, it didn't exist?

17     A.   That's right.

18     Q.   That's absurd.

19     A.   Well, I'm sorry you may think it's absurd.

20     Q.   That's absurd.

21     A.   The fact of the matter is you have to

22 articulate what you see --

23     Q.   So if I go to a homicide and I forget to put in

24 the report that there's a body on the floor, that means

25 it doesn't come in and there's no probable cause?