127

1          A.   That's right.   You to go a homicide scene and

2    you don't have a body, you don't know that you have a

3    homicide if you don't have a body --

4          Q.   It's there.   It's laying on the floor.   You

5    just left it out of your report, it means it didn't

6    happen?

7          A.   I'm not going to sit here and argue with you,

8    Mr. Burandt.   I'm going to tell you it's my opinion that

9    one cannot analyze what somebody had in their mind but

10   did put in their report.   My job is to analyze to

11   determine from the materials presented whether or not

12   there was probable cause to believe that a domestic

13   violence situation occurred.

14          I'm testifying today that based upon the

15   materials that I reviewed, they did not articulate any

16   injury, so therefore, it doesn't meet 741.28.   If I'm

17   wrong in that interpretation, then the next question

18   becomes whether there was probable cause to make an

19   arrest for anything.   And I'm saying to you that there

20   wasn't probable cause, because these officers didn't

21   articulate the issues that were incriminating to create

22   the level of proof to be probable cause.

23          Then the third thing is is whether the force

24   used at the jail against Bonita Rosa was objectively

25   reasonable or not, not in compliance with the continuum

128

1  of force, but whether it was in compliance with Graham v.

2  Connor objective reasonableness test.

3        My opinion is that there wasn't probable cause

4  and it wasn't a proper statute, so therefore, the use of

5  force had to be improper.  If I assume that there was a

6  proper charge and there was probable cause, then my

7  opinion is that the use of force was not objectively

8  reasonable because it was excessive.  It was more than

9  necessary to control the situation given the Graham v.

10 Connor test of three things they say to test:  The

11 seriousness of the crime.  In this case the seriousness

12 of the crime was not getting the jewelry off fast enough.

13 I didn't know that was a crime.  Two, the level of

14 resistance, and whether the person, three, was attempting

15 to escape.  She wasn't attempting to escape.  And the

16 level of resistance, depending on facts of Millhorn or

17 Bonita Rosa, did not justify an arm bar.

18     Q.   Sir, this isn't an opportunity for you to just

19 ramble on.  I'd appreciate it if you'd just answer my

20 questions yes or no so I can get out of here.  Is that

21 fair enough?  If you don't understand the question --

22     A.   I understood the question and I hope you

23 understood the answer.

24     Q.   I understood the answer.  But I'm just asking

25 certain questions and I'd like to stay on track so we can

129

1   get out of here.

2           You believe that in order for an officer to

3   arrest for domestic violence when he doesn't see, there

4   has to be a physical injury; is that your testimony?

5       A.   That is the requirement to be exempt under the

6   warrantless arrest under 91.15.

7       Q.   And you agree with an assault there's no

8   touching, correct?  Why don't you describe briefly in ten

9   words or less what an assault is?

10      A.   Verbal threat, verbal -- battery is touching.

11      Q.   Now, if we had an assault, we wouldn't have any

12  evidence of a physical injury, is that correct?

13      A.   That's correct.

14      Q.   So how does an officer then arrest for domestic

15  violence means "any assault comma"?

16      A.   If there was an injury and you're going to

17  arrest without a warrant and you're looking to arrest

18  that way, you have to have a -- you have to charge them

19  with domestic violence, a battery of some sort.

20      Q.   Now, wait a minute.  The statute says that

21  domestic violence means any assault.  And with an assault

22  we don't have a physical injury.  So do you want to

23  reconsider --

24      A.   You can have.

25      Q.   You can have a physical injury in assault?

130

1    A.   Sure.

2    Q.   How do you have a physical injury in a verbal
3    assault?

4    A.   You don't in a verbal.

5    Q.   It says: "Domestic violence means any
6    assault." So I verbally assault my wife. She's not
7    going to be injured, is she?

8    A.   If you have an assault, battery, sexual
9    assault, sexual battery, any criminal offense resulting
10   in a physical injury --

11   Q.   Or any physical. You keep -- those are two
12   separate sections, sir. They are not read together.
13   They can't be read together. You can't have an assault
14   which results -- a simple assault, verbal assault that
15   results in an injury. So your whole premise, the whole
16   of your testimony is misguided.

17   A.   Oh, I see what you're saying. You're saying
18   the "or" there meaning criminal offense resulting in
19   physical injury.

20   Q.   Or any other -- it should say, "or any other
21   criminal offense". They just happened to leave the word
22   "any" out of there.

23        So your whole testimony is based on this
24   premise that in order for an officer to arrest, there has
25   to be some physical -- evidence of physical injury; isn't

131

1   that correct?

2       A.   My whole premise is that it doesn't meet the

3   domestic violence definition as I understand it in

4   Florida.

5       Q.   Sir, did you happen to read Florida Statute

6   901.15?

7       A.   Yes, sir, I did.

8       Q.   So you know that this says that an officer "can

9   arrest for probable cause to believe that a person has

10  committed an act of domestic violence as defined by

11  741.28"?  That means that if I verbally assault my wife

12  and they come out there and there's probable cause to

13  believe that I verbally assaulted my wife without injury,

14  they can arrest me.  Would you agree or disagree with

15  that?

16      A.   I would disagree with that.

17      Q.   Based on what?

18      A.   Based upon the definition of domestic violence

19  under 741.28 as I read it.

20      Q.   But how do you have an injury when there's just

21  a verbal assault?

22           You're shaking your head no.

23      A.   I don't know.

24      Q.   I'll tell you how it makes sense.  The only way

25  it makes sense is that you can arrest for any of those

132

1    things or you can arrest for -- where is the definition?

2          You can arrest -- "domestic violence means any

3    assault, battery, aggravated battery..." and it goes down

4    and it says, "or any criminal offense resulting in

5    physical injury."  That should say, "or any other

6    criminal offense resulting in physical injury."

7         A.   Well, I don't know what it should or should not

8    say, Mr. Burandt.  As you know, that's going to be a

9    matter for the Court, not a matter for you or me.

10        Q.   But you would agree that your whole opinion of

11   probable cause is based on the premises there, because

12   they didn't allegedly put in their report that there was

13   a physical injury; is that correct?

14        A.   No.  I'll try one more time to say that if I am

15   wrong -- and the Court will certainly make a ruling at

16   some point as to whether 741.28, the incident there of

17   Bonita Rosa fell under the definition of domestic

18   violence.  If I'm wrong, that only means that there

19   was -- they had the authority to arrest without being

20   present and without a warrant under 9 -- whatever it is.

21        Q.   901.15.

22        A.   901.15.  Then the next question becomes:  Was

23   probable cause to arrest?

24        Q.   Let's go to that question.  Well, let me ask

25   you this.  Do you believe that any -- Reiman is a new

133

1 officer.  You've already testified that you realize that,

2 right?

3     A.    That's correct.

4     Q.    Do you think anybody acted in any kind of bad

5 faith here?

6     A.    I don't make any interpretations as to the

7 credibility of witnesses and whether they are acting in

8 good faith or bad faith.

9     Q.    Now, wait a minute.  You went on in great

10 detail to talk about errors in skill, errors in judgment,

11 and errors of the heart.

12     A.    Right.  Right.

13     Q.    Do you think there was any errors of the heart

14 here?

15     A.    Do I think there were any errors of the heart?

16     Q.    Yes.

17     A.    I don't make these kind of judgments in cases.

18 I do if I'm taking disciplinary action against one of my

19 own employees and I interview them and I sit down, "What

20 was the basis for your decision?"  And they say, "I just

21 didn't like the color of that guy's shirt."  That's error

22 of heart and I'm going to take action against it.

23     Q.    Did you find anything here that would rise to

24 that level?

25     A.    No.

134

1    Q.   Do you think these officers should be in this

2  lawsuit as individuals?

3    A.   Do I what?

4    Q.   Do you think these officers should be in this

5  lawsuit as individuals?

6    A.   That's not a question for me.  That's a

7  question for the court and for the lawyers.

8    Q.   Did you see any reason to list them as

9  defendants in this case?  Do you have an opinion as to

10 that?

11   A.   I don't have any opinion as to whether they

12 should be individually or not.

13   Q.   Let's move to step two, because I'm still

14 flabbergasted by the fact that you would say that these

15 officers are limited in their testimony to what's in

16 their report.  Am I understanding that correct?

17   A.   I'm sorry that you're flabbergasted.

18   Q.   Is that what you're saying?

19   A.   I'm saying to you that when a person makes an

20 analysis, I can only make an analysis of what is down in

21 the written material.  I can't make an analysis of

22 materials that's in that head of the officer that was

23 never articulated, never expressed.

24        So if I'm asked, was there probable cause to

25 make an arrest, only thing that I can look at is what

135

1   that officer articulated either in a probable cause

2   affidavit when they filed for a warrant, or in absence of

3   that, their incident offense record and what they

4   articulated.

5       Q.   Let me see if I can ask this question

6   differently.  Are you saying that a police officer when

7   he testifies in court can only -- let's say in a criminal

8   setting, is limited to only testifying to what's in his

9   police report that he wrote at that time?

10      A.   No, I'm saying --

11      Q.   Just answer yes or no.

12      A.   The answer to the question is not a yes and no.

13  It's what the officer knew and when he knew it.  If he's

14  in court and he learned later of exculpatory information,

15  he should tell the Court that.  If he learned later of

16  incriminating information, he should tell the Court that.

17  But in terms of the probable cause analysis, it's what

18  the officer knew when he made the decision to arrest

19  under probable cause standard.  I can't make it any

20  clearer than that.

21      Q.   And for you, you're looking back 20/20 now, so

22  you're saying that I've got to look at his report and

23  that's all I can look at to determine?  You made a

24  determination that there wasn't probable cause for the

25  arrest, correct?

136

1      A.   Yeah.   I think we're all looking 20/20, are we

2  not?

3      Q.   But you're saying -- are you now saying that

4  you're limited to that officer's report only?

5      A.   I thought I just answered that.   I don't mean

6  to be argumentative.

7      Q.   You are being argumentative.

8      A.   You're asking the same question again.

9      Q.   You've read the deposition, correct?

10     A.   Yes, I read the deposition.

11     Q.   Did you read -- and I realize we're not going

12 to necessarily trust an officer who leaves something out

13 of his report and then comes back and month or two months

14 or six months later and says, "Oh yeah, I got to put in

15 my report this, that, or the other thing."

16     A.   Mm-hmm.

17     Q.   But let's go back to Santana's deposition.   Do

18 you know who he is?

19     A.   Yes.

20     Q.   He was the boyfriend that was attacked.

21     A.   Right.

22     Q.   Do we agree that a battery is an unlawful

23 touching without the consent of the alleged victim?

24     A.   I accept that definition.

25     Q.   And do we agree that if I throw something at

137

1   you and hit you with it, that that's a battery?

2        A.   It can be, yes.

3        Q.   I just had a case where the judge found that

4   spitting on somebody was a battery.  Would you agree with

5   that?

6        A.   If a judge found that, I have to agree with it,

7   wouldn't I?

8        Q.   I'm sure you've taught your officers that they

9   can arrest for somebody spitting on them, right?

10       A.   Yes, I believe that's....

11       Q.   Did you read where Santana testified under oath

12  that she picked up a black screwdriver -- let me read it

13  to you, page 63.  So you understand the first part of the

14  question.

15           "Is this officer saying that he made contact

16  with him on that night?

17              "Answer:  Yes.  That's true.

18              "Question:  Yes --

19              "Question:  You gave him your birth date of

20  1/11/39?

21              "Answer:  Yes.

22              "Question:  And you told him --

23              "MR. NEEL:  Please remove your hand.  Thank

24  you.

25              "MR. BURANDT:  And you told him you had an

138

1  argument with Ms. Rosa.   True?

2         "I told him that Rosa was arguing with me.   The

3  two of us were arguing.   She was arguing with me and I

4  was arguing with back with her.

5         "Question:  And that Ms. Rosa proceeded to pick

6  up a black screwdriver.  Did you tell the police officer

7  that?

8         "No.  My friend was the one that I believe that

9  told him that.  When I saw her with the screwdriver was

10  when she was stabbing my car already.

11         "Question:  The friend, again, is Pedro?

12         "Answer:  Pedro.

13         "Question:  Okay.  And then it says that you

14  retreated and picked up a green plastic lawn chair."

15         "Answer:  "Yes.  I grabbed it just in case she

16  would do something to me just to protect me.  It was just

17  a chair that was in front of me over there.

18         "Question:  The lawn chair was there already?

19         "Answer:  Yes, that's the chair I used to sit

20  when I was living there.

21         "Was there just one chair there?

22         "I believe there were two, one of the same two

23  color."

24         "And then it said that she advanced.  It says,

25  'Ms. Bonita advanced on Mr. Santana.'  Did she advance on

139

1   you?

2        "Yes.

3        "And you swung the chair and knocked the

4   screwdriver from her hand."

5        Then it goes on and talks about the

6   screwdriver.  Then it talks about:  "Did you tell the

7   police officer that?

8        "Yes."

9        So we know that Officer Reiman now had this

10  knowledge, that there was a screwdriver, that she was

11  attacking his car, that she picked the screwdriver up and

12  tried to attack him with the screwdriver.  If you read

13  the other definition of Pedro, the witness, he says that

14  Rosa threw the screwdriver at Santana.  Santana doesn't

15  say that.  Santana says he knocked the screwdriver out of

16  her hands.

17       A.   I agree.

18       Q.   So now we have two people arguing, living in

19  the same house.  We have a screwdriver involved.

20            By the way, I noticed, is there any reason why

21  you left out in the description of the call that they

22  were responding to a crazy woman?  Did you pick that up

23  in the transcript?

24       A.   No.

25       Q.   Okay.  Well, they were responding to a crazy

140

1  woman with a screwdriver.

2       A.   Wait a minute.  Excuse me.  I don't remember

3  seeing anything about "crazy" in the dispatch

4  transcript -- or in the incident card, dispatch card.

5  But she wasn't arrested for being crazy or anything,

6  protective custody.

7       Q.   But that goes to your probable cause.  I'm

8  responding to a run where somebody is telling me there's

9  violence, there's a woman that's crazy.  I get there.

10  The witness tells me that there's a screwdriver involved,

11  that the woman has attacked the car.  Woman has attacked

12  Santana.  The witness verifies that, orally verifies

13  that.  And you're saying that's not probable cause?

14       A.   I'm saying, if you're saying to me that a

15  report that the person is crazy goes to the probable

16  cause determination, I'm telling you that that's an

17  equivocal fact.  Crazy, what does that mean?  Mentally

18  ill?  Mentally deranged?  Violent?  It's just a term,

19  "crazy."  And that could go to the determination of

20  whether or not you're going to take her into protective

21  custody to keep her from hurting herself, but not a

22  determination of whether there was a domestic violence,

23  unless I'm really slipping up on what probable cause is,

24  and I've dealt with it a lot over the years.

25       Q.   Have you ever responded to a domestic violence

141

1   call?

2        A.   Yes, I have.

3        Q.   How many have you responded to?

4        A.   Very few.

5        Q.   Did they involve crazy ladies?

6        A.   (No response.)

7        Q.   You do realize that that's probably one of the

8   most dangerous calls to respond to, don't you?

9        A.   Mr. Burandt, you know, I've responded to calls

10  over the years before they were called domestic violence

11  situations, and I responded to them since they were

12  called domestic violence, and I do know that about

13  33 percent of the murders in Florida, homicides, are

14  called domestic violence homicides.  Half of them

15  are named domestic -- yeah, it is a dangerous call.

16       Q.   From a police officer's standpoint you're on a

17  heightened sense of caution, correct?

18       A.   You should be.

19       Q.   That goes into your probable cause, doesn't it?

20       A.   No.  What goes into your --

21       Q.   Well, you said that.  You said earlier that all

22  this stuff that, you know, goes into it, the officer's

23  knowledge -- I don't remember what you expounded upon.

24  But one of the factors of the probable cause is what

25  you're going there for.  You're going to take that into

142

1 consideration. You're going to take into consideration

2 what you see when you get there, correct? The physical

3 evidence, correct?

4      A.   Well, yeah.

5      Q.   Are you going to take that into consideration

6 in determining probable?

7      A.   You should.

8      Q.   And then you're going to take into

9 consideration the statements that are made to you,

10 correct?

11      A.   You're going to take into consideration

12 everything that you observe or learn of there and balance

13 it out whether -- consider whether it's incriminating or

14 exculpatory in nature.

15      Q.   Do you agree that the physical evidence is more

16 reliable than the statements made by the parties?

17      A.   It can be.

18           MR. ALLEY:  Do you mind if I start going

19      through some of this stuff?

20           THE WITNESS:  I don't mind --

21           MR. ALLEY:  Thank you.

22           THE WITNESS:  -- unless I need to refer to it

23      when he's asking questions.  For example, I'd like

24      to have my report back, so I can answer a question.

25           MR. ALLEY:  It's right here.

143

1          THE WITNESS:   To answer your -- wait just a

2     second.   To answer your question, Mr. Burandt, it's

3     one of the reasons why I put in here that there was

4     no exigent circumstances articulated by Officer

5     Reiman or Millhorn.   Because you're suggesting to me

6     that because an officer knows that a domestic

7     violence call can be dangerous, that that should go

8     into the probable cause determination for an arrest.

9     And I'm saying to you that if you articulate in your

10    report and the person is analyzing what happened

11    there and there's an expression of exigent

12    circumstances, that is, that when you get to the

13    scene Ms. Rosa is saying, "As soon as that officer

14    leaves here, I'm going to kill you, I'm going to go

15    get a gun," that should be articulated in there,

16    which is one of the reasons why you make an arrest,

17    because that's an exigent circumstance and you think

18    there's going to be harm occurring once you leave.

19    If it's not articulated, it didn't happen as far as

20    I'm concerned.

21 BY MR. BURANDT:

22    Q.   If something happens, it happens.   Whether or

23 not it's reported or not is a totally different story.

24    A.   You know, I've been in a lot of depositions and

25 I've never had an attorney ever tell me my opinion is

144

1   absurd.  We'll let the Judge decide whether it's absurd

2   or not.

3       Q.   I mean you're saying if it's not in a report,

4   if didn't happen?

5       A.   I'm saying that when I make an analysis of an

6   incident that I can't make a determination of, what my

7   opinion is --

8       Q.   So in your mind it didn't happen?  But after

9   you get these depositions and you read through these

10  depositions and you have the alleged victims saying that,

11  "I told it police this," shouldn't you reevaluate your

12  position?  I mean, you didn't take any of this into

13  consideration what they told the police, what they said

14  they told the police?

15      A.   He said he said that.  Whether Mr. Millhorn or

16  Mr. Reiman heard it and knew about it at the time is what

17  the question is.  And you didn't know that and I don't

18  know that, because the reason we don't know was because

19  it wasn't put in the report and articulated.

20      Q.   It's in their depositions.  It's in Reiman's

21  deposition what they told them.  It's in their

22  depositions what they told them.  Sir, I've got to

23  believe that both of these people aren't lying to us.

24      A.   You know, you can make your determinations all

25  you want to about evaluating the credibility of witnesses

145

1   and all that, but experts are not given that luxury.  We

2   have to go on the basis of the facts presented to us.

3       Q.   And the facts presented to you are in those

4   depositions.

5       A.   The facts presented to me are based upon what

6   the officers articulated they knew at the time they made

7   the probable cause decision to make the arrest, not what

8   they spoke of later.

9       Q.   So you didn't rely on any of those depositions

10  in forming your opinion?

11      A.   Certainly, I rely on parts of the depositions,

12  but I don't rely on stuff that they say happened, you

13  know, whenever -- I primarily relied upon what they said

14  was in their reports that they articulated.  And I don't

15  know how anybody could do otherwise.

16      Q.   Well, you read the depositions, you recreate

17  what happened that day, and you look at everything, and

18  you say, "Okay, it wasn't in their report, but it's

19  pretty obvious that the officer was told this, this, and

20  this, which would establish probable cause."

21           If you're not willing to do that, then

22  personally I don't think your report is worth anything,

23  because it's just based on the written report of Reiman,

24  who I agree it's very limited and poorly written report,

25  if that's what you want to hear.  But that doesn't mean

146

1    the facts of that day didn't happen as these people in

2    their deposition say they happened.  You just want to

3    say, it's a bad report, bad police officers, that's it,

4    that's the end of the story.  I don't believe that's the

5    way the system works.

6          A.    You know, I'm here to answer to your questions.

7          Q.    I listened to your recitations of what you

8    believe, sir.  I'm going to bore you with mine.

9          A.    I'll listen to you.  Go ahead.

10         Q.    Now, let's go to after the arrest and we go

11   into the police station and she's asked -- where do you

12   read in this officer's report that she was told to take

13   her jewelry off, and if she didn't, they were going to

14   break her arm?  Why do you read that in writing in

15   Reiman's report?

16         A.    I don't.

17         Q.    Where did you read that?

18         A.    In Bonita Rosa's deposition.

19         Q.    So how come you can use Bonita Rosa's

20   deposition, but you can't use Reiman, Santana, and

21   Millhorn's depositions?

22         A.    Well, I not only used Bonita Rosa's deposition

23   testimony, I've used Millhorn's deposition testimony and

24   Reiman's deposition testimony in terms of the use of

25   force.

147

1      Q.   And they said -- they admitted to you in that

2  deposition that they told her to take her jewelry off or

3  they'd break her arm?

4      A.   No, they didn't say that.

5      Q.   They asked her to take her jewelry off.

6      A.   Right.

7      Q.   Don't we normally inventory a defendant's

8  jewelry when you arrest them?

9      A.   I guess it depends on the jail policy and

10  whether you do or not.  Obviously they didn't inventory

11  this very well.  It disappeared.

12      Q.   Allegedly disappeared.

13      A.   Well, you're right, allegedly.

14      Q.   It's not in Reiman's report, is it?

15      A.   No, it's not in Reiman's report.

16      Q.   If it's not in his report, it doesn't exist?

17      A.   Right, right.  It's not part of the issue of

18  this case as far as I'm concerned.

19      Q.   So you have seen this video, I assume?

20      A.   Yes, I saw the video.

21      Q.   Now, is an officer supposed to retreat from an

22  assault?

23      A.   He's not obligated to retreat.

24      Q.   The officer is allowed to use reasonable force

25  to resist force, is that correct?

148

1          A.     An officer is authorized to use reasonable

2     force to overcome resistance, that's correct.

3          Q.     Are you aware of any statute in Florida that

4     talks about the use of force?

5          A.     771 something or other.  I haven't looked at it

6     in a long time.  Are you talking about an officer's

7     authority to use force?

8          Q.     Yes.

9          A.     I haven't looked at it in a while.

10         Q.     But you are aware that there's a statute?

11         A.     Certainly, I'm aware there's a statute.  It

12    can't be in conflict with the U.S. Supreme Court however.

13         Q.     And you saw the video?

14         A.     I saw the video.

15         Q.     And do you see the difference in these two --

16    we have taken and frozen two scenes.  Do you recognize

17    any of these officers down here?

18         A.     Yes.

19         Q.     I guess you're assuming that's Officer Millhorn

20    because he's leaning over the defendant?

21         A.     Right.

22         Q.     The plaintiff in this case?

23         A.     Mm-hmm.

24         Q.     Do you see him go back here?

25         A.     Do I what?

149

1  Q. Do you see him go back?

2  A. I see what appears to be that way.  He's

3 bending over, yeah.

4  Q. Why do you think he did that?

5  A. I don't know, because you're taking a 1/60th of

6 a second.  You know that's another reason why they say

7 you take into consideration the totality of the

8 circumstances and when you take into consideration --

9  Q. You're going off on a different tangent.

10  A. I am?

11  Q. You don't know why he went back?

12  A. Neither do you.

13  Q. Well, he testified that he went back -- and

14 this is in his report -- because she moved back or tried

15 to elbow him or push him away.

16  A. That's not what he said in his report.  What's

17 the question?

18  Q. If in fact she elbowed him, would that -- would

19 the use of force that he used to grab her arm and go --

20 and lean up against her in your opinion be reasonable?

21  A. No.

22  Q. And you base that on what?

23  A. I base that on the analysis that we are

24 instructed to follow in Graham v. Connor that you

25 consider the totality of the circumstances.  That's why I

150

1  say totality of the circumstances.  You consider at

2  least -- you consider at least three things:  One,

3  whether or not the person is -- the seriousness of the

4  crime being committed.  Here is a woman being booked, you

5  know, and I don't know that it's a crime not to move fast

6  enough to take off jewelry.

7       Then the second question is by -- according to

8  U.S. Supreme Court in Graham v. Connor is whether or not

9  the person is attempting to evade arrest by flight.  I

10  don't believe that in any circumstance here anyone would

11  argue -- I hope not -- that she was attempting to evade

12  arrest by flight at this point.

13       And then the third one is, is you take into

14  consideration the level of resistance.  Well, the level

15  of resistance certainly does not in this case justify an

16  arm bar technique by a person who is much larger, taller,

17  et cetera, et cetera, which results in a broken arm.

18       Q.   If in fact she elbowed this officer, would that

19  have been crime?  Yes or no?

20       A.   No, not if it wasn't an intentional an assault

21  on her part.  She's trying to keep from having her

22  jewelry removed, whether it was intentional or not.

23       Q.   So you're saying she's trying to prevent

24  someone from removing jewelry, she elbows him and that's

25  not intentional?

151

1          It's contradictory, I'm sorry.  If that's what

2    she's trying to do and she elbows that officer, you're

3    saying that's an unintentional act?

4        A.   I'm saying I don't know that you know or we

5    know.  All we can go on is the basis that she said that

6    she was trying to -- going to remove her own jewelry.

7    Now, whether or not you interpret that as a crime, we'll

8    just have to let the court and jury decide that.

9          I'm saying to you that the objective test here

10   is the reasonableness test and I've analyzed that under

11   the objective reasonableness test, not what you're saying

12   happened, not within the continuum of force, but on the

13   basis of the legal standards provided, and it wasn't

14   objectively reasonable to put an arm bar technique on

15   somebody under these circumstances without --

16       Q.   What do you think would have been the force?

17   What should he have done?

18       A.   What should he have done?  He should have

19   given, "Hey.  Take off the jewelry."

20       Q.   He said that several times.  The witnesses all

21   said that.

22       A.   So why didn't he do it again?

23       Q.   How long did he have to do that?

24       A.   Why not OC?  OC is considered to be a level of

25   force that's lower than, if you want to talk about