UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BONITA ROSA,

                    Plaintiff,

vs.                                   Case No.  2:05-cv-481-FtM-29SPC

CITY OF FORT MYERS; FORT MYERS
POLICE DEPARTMENT; DAVID MILLHORN;
CHRISTOPHER REIMAN,

                    Defendants.
_____

## OPINION AND ORDER

_____This case relates to claims of unlawful arrest and excessive force by two officers of the Fort Myers Police Department. Currently at issue are six summary judgment or partial summary judgment motions and supplemental material (Docs. #77, 124, 126, 129, 135, 138, 139, 142, 143) and responses and supplements thereto (Docs. #116, 117, 118, 128, 130, 131, 155, 159, 164, 170, 171, 174.)

**I.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue at to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the

outcome of the suit under governing law.  Id.

The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. Northern Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004).  To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d at 1225.  If there is a conflict in the evidence, the non-moving party's evidence is to be believed and all reasonable inferences must be drawn in favor of the non-moving party.  Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003).  If a videotape capturing the events blatantly contradicts plaintiff's version of the events, the Court should view the facts in a light most favorable to the videotape.  Scott v. Harris, 127 S. Ct. 1769, 1776 (2007).

## II.

Plaintiff Bonita Rosa (plaintiff or Rosa) filed a four-count

2

Amended Complaint (Doc. #41).  Count I alleges, pursuant to 42 U.S.C. § 1983, the use of excessive force by all defendants.  Count II alleges, also pursuant to 42 U.S.C. § 1983, false arrest and detention by all defendants.  Count III alleges, pursuant to 42 U.S.C. § 1983 and § 1985, that all defendants conspired to interfere with plaintiff's civil rights and deprive her of liberty without due process of law in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States. Count IV alleges, pursuant to 42 U.S.C. § 1983 and § 1985, that the City of Fort Myers and the Fort Myers Police Department are liable for the constitutional violations based on a failure to properly train their officers.

The relevant material facts are as follows:

**A.  The Arrest:**

On the evening of April 30, 2004, the Fort Myers Police Department received a 911 call about a husband and wife fighting at 1121 Rose Avenue.  The dispatcher was told that a husband and wife were fighting and the "woman is real crazy"; the fighting was actually "just yelling at each other," but the caller wanted the police because "the woman is crazy"; the woman "destroyed the car of my friend," with a screwdriver; the woman was trying to hit the man with the screwdriver; and that nobody was hurt or needing an ambulance.  The caller requested that the police be sent to the house.  The only description obtained by the dispatcher was that

the woman was Hispanic and wearing a pink shirt.  After a 27 second pause in the 911 tape, the caller said the woman was threatening the car and his friend was in the car.  (Doc. #122-2.)

Officers Christopher Reiman (Officer Reiman) and David Millhorn (Officer Millhorn) were dispatched to 1121 Rose Avenue and arrived in the same vehicle.  Officer Reiman summarized what they knew from the dispatcher as follows: "To the best of my knowledge, there was a crazy lady with a pink shirt on and a screwdriver trying to – – attacking a car and also trying to attack an Hispanic male."  Upon arrival, the officers found plaintiff Rosa, Horacio Santana (Santana), and Luis Pedro Perez Ochoa (Ochoa) outside the house.  It was later determined that Ochoa had placed the 911 call at the behest of Santana.  Neither officer observed any illegal conduct upon their arrival or at any time prior to the arrest of Rosa.

Officer Millhorn testified that upon their arrival he observed Rosa screaming at Santana while ten or twelve feet apart; Officer Millhorn described Rosa as being upset and agitated.  Officers Millhorn and Reiman asked Rosa what was going on.  Rosa stated she was having an argument and fight with her boyfriend.  Officer Millhorn asked where the boyfriend was, and Rosa pointed to Santana standing in the carport area.  Officer Millhorn testified that Rosa stated she had been hit by Santana, and pointed to her right arm. Officer Reiman observed a little swelling and a red mark; Officer Millhorn observed light bruising on Rosa's lower and upper arms,

4

but more on the right side.   Officer Reiman then went over to Santana while Officer Millhorn stayed with Rosa.

Officer Millhorn testified that when asked how she got bruised, Rosa told him that she and Santana had a fight.   Officer Millhorn testified that Rosa said words to the effect that if Santana had not knocked the screwdriver out of her hand she would have stabbed him.   Rosa screamed at the officer and Santana "Ain't no man gonna diss me, ain't no man gonna touch me, he dissed me."   Officer Millhorn testified that Rosa told him she was upset that Santana had another girlfriend and she just found out about it that day, and she and Santana had been together so long, how could he diss me like that.

Officer Reiman testified that he asked Santana what had occurred, and Santana stated that Rosa had torn up their car with a screwdriver.   Officer Reiman observed damage to the vehicle consisting of scratch marks on both sides and the trunk, and the inside lining hanging down.  Officer Reiman asked Santana if he had struck Rosa, and Santana said he had struck Rosa with a plastic chair.   Santana stated that he had not been struck by Rosa.   Officer Reiman then detained Santana and placed him in handcuffs in the back of his patrol vehicle pending further investigation.

Officer Reiman testified that he then spoke with Ochoa, who stated he was the person who called 911, that Santana had come home with another woman, and Rosa had seen this and became very upset and began arguing verbally with Santana as the female left.   Ochoa

also told Officer Reiman that Rosa got a screwdriver from the carport and started to damage the vehicle. Santana then approached Rosa and asked her to stop attacking the vehicle, and she approached Santana with the screwdriver extended. Santana then picked up a green lawn chair and used it to hit Rosa on the right arm, knocking the screwdriver from her hand. At Officer Reiman's request, Ochoa repeated the statement.

Officer Reiman testified he went back to Santana and asked if Santana could verify Ochoa's statement. Santana nodded several times, and Officer Reiman un-detained him and had him sit in a lawn chair. Officer Reiman then located the screwdriver next to the vehicle in the approximate area where Santana had been standing.

Officer Reiman and Officer Millhorn conferred, and decided to arrest Rosa for domestic violence assault. Officer Reiman arrested Rosa, asked if she wanted to make a statement, and explained the basis of the arrest. Rosa was handcuffed, placed into the back seat of the patrol car with some difficulty because of her large size[1], and taken to the police department. Santana had not stated he wanted to make a complaint against Rosa for assault, and both Santana and Ochoa refused to provide a sworn written statement at the scene.

During his subsequent deposition Ochoa testified he loved Rosa like a sister and Santana like a brother; that he had called the

---

[1]Plaintiff stated in a Declaration that she was 4'11" tall and weighed approximately 220 pounds. (Doc. #124-2, ¶ 5.)

6

police at Santana's request because Rosa was a little bit out of control after finding out Santana was with another woman, and she and Santana had a fight; that he heard them yelling at each other; that Rosa was hitting the car with the screwdriver; that he wanted the police to come and control them because he was afraid that otherwise something would happen, like a bad hit because Rosa had a screwdriver and was destroying the car, or that they would have kept hitting each other, or something might happen that was going to be bad for either one; that he was afraid that Rosa would hurt Santana if the police did not stop what she was doing; that he had seen Rosa throw the screwdriver at Santana which bounced against him; and that he did not see Santana pick up a chair and knock the screwdriver out of Rosa's hand.  Ochoa confirmed that he had told the police Rosa had a screwdriver and had tried to attack Santana and the car with the screwdriver, but did not remember telling the police a chair had been thrown.  Ochoa confirmed that the officers picked up the screwdriver.

Santana testified during his deposition that he and Rosa were verbally arguing about the other woman, although the other woman was not present, and Rosa began using a screwdriver to damage their car.  Santana asked her to stop, but she refused and acted crazy, speaking loudly while stabbing the car seats.  Santana asked Ochoa to call the police.  When Santana saw that Rosa was being arrested, he asked the officers to let her go because she didn't do anything. Santana did not tell the police that Rosa had threatened him with

a screwdriver, but Santana heard Ochoa say that to the police. Rosa had thrown a screwdriver at him without his permission, and the screwdriver hit his chest without causing injury.   Santana grabbed a plastic chair as protection just in case Rosa would do something to him.  Santana testified that Rosa advanced on him, but he did not knock the screwdriver out of her hand with a chair because Rosa threw the screwdriver at him.

Rosa testified by deposition that Ochoa had called the police because she and her live-in boyfriend Santana were arguing about another woman Santana had brought to the yard.  Rosa believed that Santana was romantically involved with this woman, and bringing her to the house was disrespecting her.  Rosa asked Santana what he was doing, and Santana did not answer.  Rosa was angry and went over to the car with a screwdriver and started tearing up the car with the screwdriver.  Santana started complaining to Ochoa about what she was doing to the car, which caused Ochoa to call the police.  Rosa dropped the screwdriver outside the car when she finished tearing up the car.  About ten minutes after Rosa got out of the car the police arrived, and at that time there was no yelling.  The police first put Santana in a police car, then let him out after 5 to 15 minutes and told her she was being arrested.  The officers then put Rosa into the police care with difficulty because of her large size.  Rosa testified that she was so upset about what had happened when Santana brought the woman home that she does not remember if she ever had any conversations with the police or not.  Santana

never struck her during the events, with the chair or otherwise.

The State Attorney's Office did not file charges against Rosa, finding insufficient evidence to prove beyond a reasonable doubt that an assault pursuant to FLA. STAT. § 784.011 was committed.

## B.   The Booking at the Police Station:

Upon arrival at the police station, Rosa was directed to the booking counter to remove her jewelry and start the booking process.  The accounts thereafter differ rather dramatically as to several material aspects.

Officer Millhorn testified that Rosa was being verbal and said don't touch me, I'll take off my jewelry myself.  Rosa then said she was not taking it off.  Officer Christine Nattiel-Brown consoled Rosa, who was still very verbal, and succeeded in calming her.  Rosa told Nattiel-Brown she was not going to take off her jewelry, and put her hands on the booking counter.  Officer Millhorn then touched Rosa to take off the jewelry.  Rosa told Officer Millhorn not to touch me, and Officer Millhorn continued to attempt to take off the jewelry, telling Rosa she was not in control here but was under arrest.  Rosa pushed back from the booking table and hit Officer Millhorn in his torso with her right elbow.  Officer Millhorn then grabbed Rosa's right arm and did a arm bar maneuver, described as a soft hand technique in which the right arm is brought behind her back, using his legs and hip to separate Rosa's legs while pushing her into the booking room table.

Officer Millhorn heard Rosa's right arm "pop" and she began to complain about the arm. Officer Millhorn contacted emergency services, and Rosa was transported to the hospital in an ambulance. It was determined that the arm was broken. Officer Millhorn denied ever saying he would break Rosa's arm if she did not take off the jewelry.

Officer Reiman testified he was present in the booking room during these events and observed what happened. Officer Reiman took the handcuffs off Rosa, and heard her told on several occasions to remove her jewelry and heard Rosa respond "no." Officer Reiman also testified he heard Rosa say words to the effect "don't touch me, I'll remove my own jewelry." Officer Millhorn was trying to remove Rosa's necklace when Officer Reiman observed Rosa pushing herself off the counter top and taking her right arm or shoulder into Officer Millhorn's mid-section. At the time, Officer Reiman was standing three to four feet directly behind Rosa. Officer Reiman observed Officer Millhorn bowing backwards from the contact. Officer Reiman observed Officer Millhorn using an arm bar technique on Rosa and heard a popping noise, which led him to believe Rosa had sustained some type of injury. Officer Reiman left to get a supervisor when Rosa complained of pain in her arm. Officer Reiman testified that nothing Rosa did in the booking room created a need to break her arm. Officer Reiman did not hear Officer Millhorn say he would break Rosa's arm if she did not take off her jewelry.

Rosa testified that Officer Reiman removed the handcuffs when she arrived in the booking room.  Officer Millhorn told her to take her jewelry off, and Rosa said he was not supposed to touch her. Rosa testified that she could not take the jewelry off because she couldn't reach back to unhook her necklaces.  Rosa testified that she was struggling to unhook her necklace, and Officer Millhorn said she was not removing the jewelry fast enough and said if she did not hurry up he would break her arm.  At that time Rosa told Officer Millhorn "Do not touch me, because I don't want no man to touch me."  At that point a female officer took off Rosa's necklaces, and Rosa took off her watch and bracelet.  Rosa said Officer Millhorn then grabbed her by the arm, put his full weight against her, and broke her arm.  Rosa denied raising her hand, or using an elbow to strike, hit or touch any officer in the booking room.  A chair was then brought for Rosa to sit, and a trash can to support her arm.  Rosa started to get sick and thought she was going to pass out, and threw up in the garbage can and urinated on herself.  Subsequently, emergency services arrived and Rosa was taken to Southwest Regional Hospital.  Rosa testified that other than removing her handcuffs upon entering the booking room, Officer Reiman did and said nothing to Rosa.

The event was recorded by a surveillance camera, and DVDs have been submitted by both parties.  See Doc. #118, Exh. A; Doc. #143. The DVDs have no sound, only a visual depiction of the events, and are discussed in more detail below.

11

**III.**

Section 1983 imposes liability on any person who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To establish a claim under § 1983, plaintiff must prove that (1) defendant deprived her of a right secured under the Constitution or federal law, and (2) such deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001). Plaintiff also must prove an affirmative causal connection between defendant's conduct and the constitutional deprivation. Marsh v. Butler County, Ala., 268 F.3d 1014, 1059 (11th Cir. 2001) (en banc); Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11th Cir. 1995).

Municipalities may be held liable under § 1983, but the municipality itself must have caused the constitutional violation at issue, and it cannot be liable on a vicarious liability theory. Skop v. City of Atlanta, 485 F.3d 1130, 1145 (11th Cir. 2007)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978)); City of Canton v. Harris, 489 U.S. 378 (1989). Therefore, to establish municipal liability plaintiff must show that: (1) her constitutional right was violated; (2) the municipality had a custom or policy that constituted deliberate indifference to her constitutional right, and (3) the policy or custom caused the

12

violation of her constitutional right. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004). Plaintiff can establish the requisite "official policy" in one of two ways: (1) identifying an officially promulgated policy, or (2) identifying an unofficial custom or practice, usually shown through the repeated acts of the final policymaker of the entity. <u>Grech v. Clayton County</u>, 335 F.3d 1326, 1320-30 (11th Cir. 2003). The policy or custom must be the moving force of the constitutional violation. <u>Grech</u>, 335 F.3d at 1330. <u>See also</u> <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997).

"[T]he City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [plaintiff's] constitutional rights." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998). To establish a claim against a municipality on the theory of failure to train its employees, plaintiff must establish (1) that there was a failure to adequately train the officers, (2) that the failure to train was a city policy, i.e., either there was an express policy or the failure to train amounts to "deliberate indifference" to the rights of persons with whom the officers come into contact, and (3) that the failure to train policy caused the officers to violate plaintiff's constitutional rights. <u>City of Canton v. Harris</u>, 489 U.S. 378, 389-91 (1989); <u>Bruce v. Beary</u>, ___ F.3d ___, 2007 U.S. App. LEXIS, 2007 WL 2492101 (11th Cir. Sept. 6, 2007); <u>Gold</u>, 151 F.3d at 1350. Plaintiff must present some evidence that the

13

municipality knew of a need to train in a particular area, and that the municipality made a deliberate choice not to take any action. <u>Gold</u>, 151 F.3d at 1350-51.  Deliberate indifference may be established by a pattern of constitutional violations or by a single decision under appropriate circumstances.  <u>Bruce</u>, 2007 WL at *12, 2007 U.S. App. LEXIS at *41.

"Conspiring to violate another person's constitutional rights violates section 1983."  <u>Rowe v. City of Ft. Lauderdale</u>, 279 F.3d 1271, 1283 (11th Cir. 2002)(citations omitted).  "To prove a 42 U.S.C. § 1983 conspiracy, a plaintiff 'must show that the parties reached an understanding to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy.'" <u>Bailey v. Board of County Comm'rs Of Alachua County</u>, 956 F.2d 1112, 1122 (11th Cir. 1992)(quoting <u>Bendiburg v. Dempsey</u>, 909 F.2d 463, 468 (11th Cir. 1990)).  Plaintiff need not produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, but must show some evidence of agreement between the defendants.  <u>Rowe</u>, 279 F.3d at 1283-1284. <u>See also</u> <u>Arline v. City of Jacksonville</u>, 359 F. Supp. 2d 1300, 1312 (M.D. Fla. 2005).  Circumstantial evidence may be sufficient if it proves the existence of the conspiracy.  <u>Burrell v. Board of Trs. of Ga. Military Coll.</u>, 970 F.2d 785, 789 (11th Cir. 1992).

Section 1985(3) imposes liability if two or more persons conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection

14

of the laws, or of equal privileges and immunities under the laws."
42 U.S.C. § 1985(3).  To prove a § 1985(3) claim, plaintiff must
establish "(1) a conspiracy, (2) for the purpose of depriving,
either directly or indirectly, any person or class of persons of
the equal protection of the laws, or of equal privileges and
immunities under the laws; and, (3) an act in furtherance of the
conspiracy, (4) whereby a person is either injured in his person or
property or deprived of a right or privilege of a citizen of the
United States."  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1190
(11th Cir. 2001)(citation omitted); <u>Trawinski v. United Techs.</u>, 313
F.3d 1295, 1299 (11th Cir. 2002).  "Unlike in section 1983 actions,
public officials therefore will not be subject to liability under
section 1985(3) unless their actions were motivated by 'some
racial, or perhaps otherwise class-based, invidiously
discriminatory animus.'" <u>Burrell</u>, 970 F.2d at 794 (quoting <u>Lucero
v. Operation Rescue of Birmingham</u>, 954 F.2d 624, 628 (11th Cir.
1992)); <u>Lyes v. City of Riviera Beach</u>, 166 F.3d 1332, 1337-40 (11th
Cir. 1999).  Qualified immunity is not available as a defense to a
§ 1985(3) claim.  <u>Johnson v. City of Fort Lauderdale, Fla.</u>, 126
F.3d 1372, 1379-80 (11th Cir. 1997); <u>Burrell</u>, 970 F.2d at 794.

**IV.**

The Fort Myers Police Department, represented by the City of
Fort Myers City Attorney, seeks summary judgment on all counts
because it is not an entity capable of being sued.  It argues that

15

the City of Fort Myers is the only entity capable of being sued. Plaintiff argues that the Fort Myers Police Department implements, creates, and enforces General Orders without intervention from the City of Fort Myers, and therefore is a separate and final decision-maker capable of being sued.

The Eleventh Circuit has noted that "[s]heriff's departments and police departments are not usually considered legal entities subject to suit." Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992). However, "capacity to sue or be sued shall be determined by the law of the state in which the district is held." Id. (citing FED. R. CIV. P. 17(b)). Under Florida law, municipalities have the power to sue and be sued, see Art. VIII, § 2(b), Fla. Const.; FLA. STAT. § 166.021, but this does not necessarily extend to a police department. "Where a police department is an integral part of the city government as the vehicle through which the city government fulfills its policing functions, it is not an entity subject to suit." Florida City Police Dep't v. Corcoran, 661 So. 2d 409, 410 (Fla. 3d DCA 1995)(quoting Eddy v. City of Miami, 715 F. Supp. 1553, 1556 (S.D. Fla. 1989)). Florida courts have consistently found that City Police Departments are *not* entities capable of suit. See Eddy, 715 F. Supp. 1553; Post v. City of Fort Lauderdale, 750 F. Supp. 1131 (S.D. Fla. 1990); Pierre v. Schlemmer, 932 F. Supp. 278 (M.D. Fla. 1996); Florida City Police Dep't v. Corcoran, 661 So. 2d 409.

In Fort Myers, the Chief of Police is appointed by the City Manager subject to confirmation by the City Council. FORT MYERS, FLA., CODE 3255, § 5, 1-7-2005. Under the City of Fort Myers, Florida Ordinances, "[t]he chief shall make rules for the conduct and direction of the police department." FORT MYERS, FLA., CODE 2563, § 1, 7-16-1990; CODE 1991, § 2-267. An Affidavit of Police Chief Hilton Daniels states that the City of Fort Myers Police Department has promulgated such rules for the Police Department. (Doc. #130-2.) An Affidavit of Chief Hilton Daniels (Doc. #45-2, Exh. A, ¶ 4) further states that the "Fort Myers Police Department is part of the City of Fort Myers and is not a separate legal entity" and that the "Fort Myers Police Department is an integral part of the city government and is the vehicle through which the city government fulfills its policing functions." (Id. at ¶ 7.) The Court concludes that the Fort Myers Police Department is not an entity capable of being sued, and therefore summary judgment will be entered in its behalf as to all counts.

**V.**

The Court will begin with the unlawful arrest and detention claim in Count II, since that is first in the chronological sequence of events.

**A. Unlawful Arrest/Detention (Count II)[2]:**

In Count II, plaintiff alleges that she was arrested and

---

[2] Count I also contains unlawful arrest verbiage, although it is represented to be an excessive force claim. The Court's discussion of Count II also applies to those aspects of Count I which refer to an unlawful arrest under the Fourth Amendment.

detained in violation of the Fourth Amendment to the United States Constitution.   Specifically, plaintiff asserts that she had committed no crime and broken no laws, that she was arrested without probable cause to believe that she had committed any crime, and that she was unlawfully detained in jail for 8 to 12 hours.

**(1) Officers Millhorn and Reiman Individually:**

Both officers seek summary judgment based on a claimed entitlement to qualified immunity.   The officers assert that they had probable cause (or at least arguable probable cause) to arrest plaintiff for domestic violence, and therefore no Fourth Amendment violation occurred when plaintiff was arrested and detained.

The qualified immunity principles are well settled.   "An official seeking qualified immunity must initially establish that he was acting within his discretionary authority.   If the official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff." McLish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).   There is no dispute that both officers were acting within their discretionary authority, under color of state law, at the time of the arrest and detention.   Therefore, the burden shifts to plaintiff to show that the officers are not entitled to qualified immunity.

To defeat defendants' claim of qualified immunity, plaintiff must establish two elements.   Plaintiff must first show that the facts, taken in the light most favorable to her, establish that

18

under present-day law the officers' conduct violated a constitutional right, in this case plaintiff's Fourth Amendment right to be free of an unlawful arrest and detention.  If so, plaintiff must show that the constitutional right at issue was clearly established, i.e., that it would have been clear to a reasonable officer that the conduct was unlawful.  Saucier v. Katz, 533 U.S. 194, 201-02 (2001); Skop, 485 F.3d at 1136-37; McLish, 483 F.3d at 1237.

There is no dispute that plaintiff was arrested and detained, and therefore the Fourth Amendment applies.  "An arrest is quintessentially a seizure of the person, and therefore subject to the Fourth Amendment's reasonableness requirement."  McLish, 483 F.3d at 1238.  "In Fourth Amendment terminology, an arrest is a seizure of the person, and the 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause to arrest."  Skop, 485 F.3d at 1137.  It is also clear that an arrest conducted in a public place must be supported by probable cause, but does not require a warrant.  McLish, 483 F.3d at 1238.  "A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim."  Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996).  Conversely, if probable cause[3] existed to believe plaintiff had been or was

_____

[3]"Probable cause exists when the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is

committing a criminal offense, her arrest would not violate the
Fourth Amendment. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004).
The existence of probable cause depends upon the reasonable
conclusions to be drawn from the facts known to the arresting
officers at the time of the arrest. <u>Devenpeck</u>, 543 U.S. at 152.
The arresting officer's state of mind (other than the facts he
knows) is irrelevant to the existence of probable cause.
<u>Devenpeck</u>, 543 U.S. at 152-53.

"While an officer who arrests an individual without probable
cause violates the Fourth Amendment, this does not inevitably
remove the shield of qualified immunity." <u>Skop</u>, 485 F.3d at 1137.
Officers are entitled to qualified immunity if there is only
*arguable* probable cause to arrest plaintiff. <u>Jones v. Cannon</u>, 174
F.3d 1271, 1283 (11th Cir. 1999) (citations omitted). "Arguable
probable cause exists when an officer reasonably could have
believed that probable cause existed, in light of the information
the officer possessed." <u>Storck v. City of Coral Springs</u>, 354 F.3d
1307, 1315 (11th Cir. 2003)(internal quotation and citations
omitted). Therefore, arguable probable cause depends on the
elements of the alleged crime and operative facts of the particular
case. <u>Skop</u>, 485 F.3d at 1137-38.

In this case, Rosa was arrested for domestic violence in

---

committing, or is about to commit an offense." <u>Jordan v. Mosley</u>,
487 F.3d 1350, 1355 (11th Cir. 2007)(internal citations and
quotations omitted).

violation of FLA. STAT. § 741.28(2). Domestic violence includes "any assault, . . . battery, . . . or any criminal offense resulting in physical injury . . . of one family or household member by another family or household member." FLA. STAT. § 741.28(2). A misdemeanor assault is "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and in doing some act which creates a well-founded fear in such other person that such violence is imminent." Knight v. Jacobson, 300 F.3d 1272, 1275 (11th Cir. 2002)(quoting FLA. STAT. § 784.011). A battery is the actual and intentional touching or striking of another person against their will, or intentional bodily harm of another. FLA. STAT. § 784.03(1)(a). A substantial certainty of a touching or striking satisfies the intent element of battery. S.D. v. State, 882 So. 2d 447, 449 (Fla. 4th DCA 2004).

"Whenever a law enforcement officer determines upon probable cause that an act of domestic violence has been committed within the jurisdiction the officer may arrest the person or persons suspected of its commission and charge such person or persons with the appropriate crime. The decision to arrest and charge shall not require consent of the victim or consideration of the relationship of the parties." FLA. STAT. § 741.29(3). Additionally, an officer may arrest a person without a warrant if he or she has probable cause "to believe that the person has committed an act of domestic violence battery" as defined by Florida Statute Section 741.28(2).

FLA. STAT. § 901.15(7).   Thus, an officer may arrest a suspect without a warrant on a charge of domestic violence battery that is not committed in the officer's presence.  <u>Wheeler v. State</u>, 956 So. 2d 517, 520 n.3 (Fla. 2d DCA 2007).

Viewed in the light most favorable to plaintiff, the material facts known to the officers at the time of the arrest were: (1) The police dispatcher received a 911 call stating a husband and wife were fighting, the woman was crazy, the woman had a screwdriver, and she was attacking a car and trying to attack the husband; (2) The officers arrived at the address and found a woman (Rosa) matching the description given in the 911 dispatch; (3) neither officers observed any illegal conduct occurring in their presence; (4) Rosa told the officers she was having an argument and fight with her boyfriend (Santana) because Santana had brought another woman home; (5) Santana told Officer Reiman that Rosa had torn up their car with a screwdriver, and Officer Reiman observed damage consistent with Santana's statement; (6) Ochoa told Officer Reiman that he was the person who made the 911 call, and had done so at Santana's request; (7) Ochoa told Officer Reiman that Rosa became very upset and began arguing verbally with Santana about the woman; (8) Ochoa told Officer Reiman that Rosa got a screwdriver and started to damage the vehicle; (9) Ochoa told Officer Reiman that Santana approached Rosa and asked here to stop attacking the vehicle, and that Rosa approached Santana with the screwdriver extended; (10) either (a) Santana picked up a lawn chair and used

it to hit Rosa's right arm, knocking the screwdriver from her hand (Officer Reiman's testimony as to what Ochoa stated), or (b) Rosa had a screwdriver and tried to attack Santana and the car with it, and Rosa threw the screwdriver at Santana, hitting him in the chest area but not causing any injury (Ochoa's deposition version)[4]; and (11) the officers found a screwdriver near the vehicle.

The Court finds that the facts known to the officers at the time of Rosa's arrest provide ample probable cause to arrest her for domestic violence.   The facts establish probable cause to believe Rosa had committed both an assault and a battery under Florida law.   The facts known to the officers were far more than those in Knight v. Jacobson, 300 F.3d 1272 (11th Cir. 2002), which were found to establish probable cause to arrest for an assault. Additionally, the officers were told by a witness not involved in the fracas that Rosa had thrown a screwdriver at Santana which hit Santana in the chest area.   This is sufficient to establish a battery.   The State Attorney's decision not to prosecute has no bearing on whether probable cause existed to arrest.   Knight, 300 F.3d at 1275.   Even a subsequent acquittal is not determinative of whether an officer had probable cause.   Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006), cert. denied, 127 S. Ct. 2429 (2007).

Because the Court finds that Officers Reiman and Millhorn had

---

[4]While Rosa denied both versions at deposition, she testified she could not recall telling anything to the officers, and thus it is undisputed the officers did not have the benefit of her version at the time of the arrest.

probable cause to arrest Rosa, the arrest and detention did not violate Rosa's Fourth Amendment rights.  Additionally, the Court finds that Officers Reiman and Millhorn are entitled to qualified immunity as to Count II and any portion of Count I relating to a Fourth Amendment violation for the arrest and detention.

**(2)  City of Fort Myers:**

Since the Court has determined that the arrest was constitutionally permissible, there can be no policy or custom that officially sanctioned or ordered a constitutional violation. McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 n.13 (11th Cir. 2003); Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996); Vineyard, 990 F.2d at 1211.  Therefore, the City of Fort Myers is entitled to summary judgment as to Count II and any portion of Count I relating to a Fourth Amendment violation for the arrest and detention.

**B. Excessive Force (Count I):**

Count I of the Amended Complaint alleges that all defendants are liable for excessive force used in the booking room.  Both sides seek summary judgment as to the excessive force count.  The individual officers assert they are entitled to qualified immunity; additionally, Officer Reiman argues he had no involvement in the conduct, and therefore cannot be liable; and the municipalities argue that the force was not excessive and in any event there was no policy which would trigger their liability.  Plaintiff, on the

other hand, argues that the evidence is undisputed that the force was excessive and that it was the result of a city policy.

**(1) Source of Constitutional Right:**

The Court's first step is to identify the source of the constitutional right to be free of excessive force. Defendants argue that the excessive force claim must be analyzed under the Fourteenth Amendment substantive due process standard. Plaintiff cites the Fourth Amendment, the Fourteenth Amendment, and the First Amendment as the basis for her excessive force count (Doc. #41, pp. 8-9).

The Supreme Court has rejected the "notion that all excessive force claims brought under § 1983 are governed by a single generic standard." Graham v. Connor, 490 U.S. 386, 393 (1989). Rather, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham, 490 U.S. at 394 (citation omitted). Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government conduct, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing the claims. Graham, 490 U.S. at 395. While noting that most excessive force claims will be analyzed under either the Fourth Amendment or the Eighth Amendment, Graham does not limit excessive force claims to one or the other

Amendment.    Rather,  "Graham  simply  requires  that  if  a
constitutional  claim  is  covered  by  a  specific  constitutional
provision, . . . the  claim  must  be  analyzed  under  the  standard
appropriate  to  that  specific  provision,  not  under  the  rubric  of
substantive due process."  United States v. Lanier, 520 U.S. 259,
272 n.7 (1997).

Therefore, different constitutional rights will be at issue in
excessive  force  claims  arising  in  different  factual  contexts.   An
excessive  force  claim  in  the  context  of  a  pre-arrest,  non-seizure
police  contact  is  analyzed  under  the  Fourteenth  Amendment
substantive  due  process  standard  even  after  Graham.   Wilson v.
Northcutt,  987  F.2d  719,  721-22  (11th  Cir.  1993);  Carr  v.
Tatangelo,  338  F.3d  1259,  1271  (11th  Cir.  2003).   However, "all"
claims  that  law  enforcement  officers  have  used  excessive  force  in
the  course  of  an  arrest,  investigatory  stop,  or  other  "seizure"  of
a  free  citizen  are  analyzed  under  the  Fourth  Amendment,  not  under
a  substantive  due  process  approach.   Graham,  490  U.S.  at  395.
Thus,  substantive  due  process  analysis  is  inappropriate  in  a  case
if plaintiff's claim is "covered by" the Fourth Amendment.  City of
Sacramento  v.  Lewis,  523  U.S.  833,  843  (1998).   A  pretrial
detainee's claim of excessive force, however, is analyzed under the
substantive  due  process  provision  of  the  Fourteenth  Amendment.
Bozeman v. Orum,  422  F.3d  1265,  1271  (11th  Cir.  2005).   A  claim  of
excessive  force  by  a  convicted  prisoner  is  analyzed  under  the
Eighth  Amendment.   Whitley v. Albers, 475 U.S. 312, 318-26 (1986).

In this case, plaintiff had been arrested and brought to the police station where she was detained as the booking process took place. Plaintiff had clearly been seized within the meaning of the Fourth Amendment by virtue of her arrest, but her status had evolved into that of an arrestee in custody. The Eleventh Circuit has analyzed such "custody" situations under different constitutional amendments. In Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002), the Court analyzed an excessive force claim during arrestee's ride to the jail under the Fourth Amendment. In Mercado v. City of Orlando, 407 F.3d 1152, 1154 n.1 (11th Cir. 2005), the Court rejected a Fourteenth Amendment analysis in favor of a Fourth Amendment analysis where a suspect was "in custody" by virtue of being surrounded by officers. On the other hand, in Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996), a suspect was arrested and transported in the back of a police car in a position which led to his asphyxiation. The Eleventh Circuit stated that excessive force claims "involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause . . ." See also Redd v. R.L. Conway, 160 Fed. Appx. 858, 860 (11th Cir. 2005)(applying Fourteenth Amendment substantive due process analysis to claims of excessive force during arrest and booking process). In Vineyard v. County of Murray, 990 F.2d 1207, 1211 (11th Cir. 1993), the Court did not decide whether force used in a hospital stop on suspect's way to jail was governed by the Fourth or Fourteenth Amendment,

finding no violation under either amendment.

The Court will therefore analyze plaintiff's excessive force claim under both the Fourth Amendment and the Fourteenth Amendment, as well as the First Amendment. While the Fourth and Fourteenth Amendment standards are similar, plaintiff has a higher burden when the Fourteenth Amendment is involved. <u>Carr</u>, 338 F.3d at 1271-72.

**(2) Legal Standards:**

Under a Fourth Amendment standard, the issue is whether the officer's conduct was objectively reasonable in light of the facts confronting the officer. <u>Graham</u>, 490 U.S. at 396-97. The use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, keeping in mind that the right to make an arrest carries with it the right to use some degree of physical force or the threat of force. This requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. This in turn requires a court to evaluate the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting or attempting to flee, the need for the application of force, the extent of the injury inflicted, and whether the force used was reasonably proportionate to the need for the force. See <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1266-68 (11th Cir. 2007); <u>Vinyard</u>, 311 F.3d at 1347.

Under the Fourteenth Amendment, the standard is the same as that employed under the Eighth Amendment. <u>Bozeman</u>, 422 F.3d at 1271. To prevail on a substantive due process excessive force claim, plaintiff must prove that defendant's actions "shocks the conscience," and mere negligence is not enough. <u>Lumley v. City of Dade City, Fla.</u>, 327 F.3d 1186, 1196 (11th Cir. 2003). To determine if an application of force was excessive, the Court considers a variety of factors, including: the need for the force and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm. <u>Carr</u>, 338 F.3d at 1271-72. This standard does not establish a bright line that would readily alert officers to a violation, and therefore qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in defendant's place to conclude the force was unlawful. <u>Id.</u>

Finally, the Eleventh Circuit has found that a First Amendment retaliation claim can exist in the context of an allegedly unlawful arrest accompanied by excessive force. <u>Phillips v. Irvin</u>, 222 Fed. Appx. 928 (11th Cir. 2007). <u>See also</u> <u>City of Houston v. Hill</u>, 482 U.S. 451, 461 (1987)("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); <u>Lewis v. City of New Orleans</u>, 415 U.S. 130 (1974). To state a claim for retaliation for exercising First Amendment

rights, a plaintiff must establish that : (1) the speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) a causal connection existed between the retaliatory conduct and the adverse effect on speech.  Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005), cert. denied, 127 S. Ct. 37 (2006)(It has been settled law since at least 1988 that government may not retaliate against citizens for the exercise of First Amendment rights.)

### (3)  Officer Millhorn Individually:

Plaintiff had been lawfully arrested and detained, and was properly being put through the booking process.  Viewed in the light most favorable to plaintiff, the facts known to Officer Millhorn at the time of the use of force were as follows: (1) Officer Millhorn had instructed Rosa to take off her jewelry, including her necklaces; (2) Rosa told Millhorn not to touch her, and initially refused to take off the jewelry; (3) Officer Millhorn told Rosa if she did not take off her jewelry he would break her arm; (4) a female police officer took off the necklaces for Rosa, who herself took off her watch and bracelet; (5) after the jewelry had been removed, and with no provocation, Officer Millhorn attacked Rosa from behind, placing her arm behind her back; and (6) Rosa's arm broke as a result of the actions of Officer Millhorn. The Court recognizes that this version of the events is strenuously disputed by the officers present.  However, at this stage of the

proceedings the Court is required to view the facts in the light most favorable to plaintiff, unless contradicted by the video.  The DVDs in this case fail to provide the necessary angle or clarity to conclusively resolve the key factual disputes.  Lacking any sound, the DVDs shed no light on whether Officer Millhorn threatened to break Rosa's arm.  Additionally, from the angle presented it cannot be determined whether Rosa struck Officer Millhorn, as he claims, or if Officer Millhorn attacked Rosa without provocation, as Rosa asserts.

With these facts, the Court finds that plaintiff's excessive force claim against Officer Millhorn survives defendant's summary judgment motion.  Plaintiff had been arrested for a misdemeanor offense; she did not pose an immediate threat to the safety of the officers or others in the booking room; she was verbally but passively resisting, and was not actively resisting or attempting to flee; she had allowed a female officer to take off her necklaces; assuming she did not first strike Officer Millhorn, there was no need to apply force in the situation; plaintiff suffered significant injury in having her arm broken; the force used was not reasonably proportionate to the need for force (under plaintiff's version of the facts); and Officer Millhorn threatened to break her arm if she was non-compliant, and then did so. Therefore, plaintiff has presented sufficient evidence to show either a Fourth Amendment or a Fourteenth Amendment excessive force claim.  Given the context of the events under plaintiff's facts,

31

the First Amendment claim also survives summary judgment.  E.g.,
Smith v. McCluskey, 126 Fed. Appx. 89 (4th Cir. 2005).

The Court is mindful of the caution in Bozeman, 422 F.3d at
1272 n.11, that threatening words alone "are far from determinative
of bad faith on the part of the Officers."  As the Court continued
to note, however, "threatening language as part of a totality of
circumstances can be relevant to what is constitutionally
reasonable or, as in this case, to the determination of reasonable
inferences about the Officers' subjective state of mind."  Id.
Under the summary judgment facts, the Court is required to assume
that Officer Millhorn threatened to break Rosa's arm if she did not
take off the jewelry, and then did in fact break her arm after the
jewelry had been removed.  Under any standard, such conduct
constitutes excessive force.  As the cases cited establish,
plaintiff's right to be free of excessive force was clearly
established under all asserted constitutional provisions as of the
events at issue in this case.

Under the same standards, plaintiff's motion for summary
judgment as to Officer Millhorn as to excessive force will be
denied.  Viewing the facts in his favor, as the Court must do in
deciding a summary judgment motion by plaintiff, plaintiff would
not be entitled to judgment under any of the constitutional rights.
In short, the facts of the case will be determined by a jury, and
those facts will determine who prevails on this claim.

### (4)   Officer Reiman Individually:

The facts are undisputed that while Officer Reiman was in the booking room he did not participate in the struggle between plaintiff and Officer Millhorn.  Plaintiff's theory is that Officer Reiman is liable because he had a duty to intervene to prevent the excessive force by Officer Millhorn.

"[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)(quotation omitted); Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 927 (11th Cir. 2000).  "This liability, however, only arises when the officer is in a position to intervene and fails to do so."  Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998).  It is clear in this case, from the testimony of the witnesses and the Court's viewing of the DVD, that Officer Reiman was not in a position to intervene.  While literally only a few feet away, the application of force by Officer Millhorn occurred rapidly and was over before it could reasonably be stopped.  Less than 10 seconds passed between the time Officer Millhorn approached Rosa to remove her necklace and the time he applied the arm bar to restrain Rosa. Only a second or two expired from the time the arm bar was applied and the time that the popping or snapping sound was heard, signaling injury.  The Court finds no constitutional violation of

33

Rosa's First, Fourth or Fourteenth Amendment rights by Officer Reiman.   Therefore, Officer Reiman is entitled to qualified immunity as to Count I.

**(5)  City of Fort Myers:**

Because the excessive force claim survives summary judgment as to Officer Millhorn, the Court must examine the liability of the City of Fort Myers.  As discussed earlier, a municipality can be liable for its officer's constitutional violations if the municipality had a custom or policy that constituted deliberate indifference to plaintiff's constitutional rights, and the policy or custom was the moving force behind the violation of her constitutional rights.

It is undisputed that the City, through its Police Department, had a written policy regarding the use of force by its police officers.  The Use of Force General Order provides that:

> [r]easonable force may be utilized in situations, which cannot be controlled otherwise.  However, other reasonable alternatives should be exhausted or clearly bee [sic] ineffective prior to the application of force. The decision to resort to force and the degree of force to be used must be based only on fact or what reasonably appears to be fact known to the officer at the time the action is taken. . . . An officer need not retreat or desist from efforts to make a lawful arrest because of active, threatened, or passive resistance. Officers must remain cognizant that a primary law enforcement responsibility is to protect life.  An officer shall use only that force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer or another [ ].

(Doc. #139-9, pp. 10-11.)  The Affidavit of Captain Scott Griffith

(Doc. #138-3, Exh. A) and Affidavit of Chief Hilton C. Daniels (Doc. #139-12, Exh. I) reiterate the existence of this policy and other General Orders (Doc. #139-9 through #139-11), and state that no other policies or customs are maintained.

The evidence is clear that this written policy was not the moving force of the excessive force.  The written policy does not show a deliberate indifference to plaintiff's constitutional right, but quite the contrary shows an explicit attempt to comply with constitutional mandates with regard to the use of force. Additionally, even plaintiff's expert testified that his problem with Officer Millhorn's conduct was not that it followed the policy but that it was in violation of the policy.

Plaintiff can also establish the requisite official policy by identifying an unofficial custom or practice.  No such evidence has been presented in the summary judgment record.  Accordingly, the Court finds that the City of Fort Myers is not liable on the excessive force claim.

## C. Conspiracy Under § 1983 and § 1985(3) (Count III):

Count III alleges that all defendants conspired to unlawfully arrest and detain Rosa, fabricate false police reports, maliciously charge Rosa with domestic violence assault, and interfere with her liberty without due process of law, in violation of the Fourth and Fourteenth Amendments.  This claim is brought pursuant to 42 U.S.C. § 1983 and 1985(3).

For the reasons discussed above, the Court has found that plaintiff's Fourth Amendment rights against unlawful arrest and detention were not violated by either officer. Because no substantive violation occurred, there can be no conspiracy. The Court also found that there is no evidence which establishes that Officer Reiman either engaged in excessive force or is liable for failing to intervene to stop the force used by Officer Millhorn. The only potential due process rights involve the excessive force claim against Officer Millhorn. Since only Officer Millhorn remains as a defendant, there can be no civil rights conspiracy under § 1985(3). Dickerson v. Alachua County Comm'n, 200 F.3d 761, 768-69 (11th Cir. 2000). Additionally, the Amended Complaint fails to allege, and the summary judgment evidence fails to show, that the actions of defendants were motivated by either race-based or gender-based animus, as required of a claim under § 1985(3). See, e.g., Moody v. Messer, 228 Fed. Appx. 859, 861 (11th Cir. 2007).[5] Therefore, the Court finds that are entitled to summary judgment.

D.  **City Liability, Failure to Train (Count IV):**

Plaintiff alleges that the City of Fort Myers implemented a policy and trained and encouraged officers to disregard the rights of those arrested, detained, and/or in custody. Plaintiff further alleges that such training was negligent and improper and Rosa

---

[5]The Court notes that plaintiff's Trial Brief (Doc. #162, pp. 11-12) argues racial animus for the first time. Since the allegations are not present in the operative pleading or evidence, the argument is insufficient.

suffered physical and mental injuries as a result of the false imprisonment without probable cause.   (Doc. #41, ¶ 54-61.) Plaintiff states that she can "bring forth evidence of a pattern of improper training and supervision and she can show that the City of Fort Myers was aware of the deficiencies in the program."   (Doc. #159, p. 11.)

Having found the arrest and detention to be lawful, there is no possible claim for failure to train as to the Fourth Amendment claim.   If Count IV also includes excessive force, it too fails. Officer Reiman did not engage in the use of any force, and was not obligated to intervene.   Therefore, the City cannot be found to have acted with deliberate indifference in training and supervising Officer Reiman.   As to Officer Millhorn, the City must be on notice of a need to train for the specific deficiency alleged, as is required to support liability on this theory.   Gold, 151 F.3d at 1350-51.

The only relevant past event was in 1987, 17 years before the instant events, when Officer Millhorn punched an individual in the face in response to repeated attempts to hit Officer Millhorn. Officer Millhorn received four hours suspension for failing to use his department issued PR 24 baton rather then his fist and placing the individual in his police vehicle to transport him home while not under arrest or to take him to detox.   Other disciplinary items in Officer Millhorn's record, unrelated to the claims herein, were: (1) a March 7, 1988 Letter of Reprimand for failure to appear in

court; (2) a July 1, 1993, Letter of Counseling for allowing his wife into dispatch; (3) a December 4, 1993 Letter of Counseling for having a firearm not registered with the Police Department at work after failing to qualify with the weapon; (4) a October 18, 1995, letter of reprimand as his Record of Employee Performance for damaging a Police vehicle; (5) a June 6, 1996, Record of Employee Performance letter or reprimand for failure to follow the rules, perform his duty as directed, to treat superiors with respect, and cooperate with departmental employees; (6)  a July 11, 1997, Professional Compliance Report to serve as a letter of reprimand for running a red light; (7) a December 13, 1998 Professional Compliance Report detailing an incident requiring more tact; (8) an October 6, 1999 Memorandum regarding the failure to file a full accident report; (9) a September 4, 2002 IA discipline report for improper pursuit; (10) a December 15, 2003, Disciplinary Action Report for failure to properly inventory purse or contents, which occurred on the street and not at the Fort Myers Police Department; and (11) a May 21, 2004, IA supervisory discipline for failure to properly secure Rosa's property in the property locker.   Other incidents were with regard to excessive leave.   Officer Millhorn was provided additional training and/or a reprimand or letter in his file for each incident.   Here, there is no evidence of any prior similar incidents in the booking process or involving Officer Millhorn for excessive force.   Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987).   The Court finds that the City is entitled

38

to summary judgment.

**V.**

In sum, defendants are entitled to summary judgment as to all counts except Officer Millhorn in his individual capacity as to Count I for excessive force.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.  Defendant Christopher Reiman's Motion for Partial Summary Judgment Based on Qualified Immunity (Doc. #77) is **GRANTED** in favor of Officer Reiman as to Counts I, II, and III (as to § 1983 only).

2.  Plaintiff's Rule 56 Motion for Partial Summary Judgment Against Defendant Millhorn in Both His Official Capacity and Individually for Excessive Force (Doc. #124) is **DENIED**.

3.  The Fort Myers Police Department's Motion to Dismiss (Doc. #126), deemed to be a motion for summary judgment, is **GRANTED**.

4.  Defendants City of Fort Myers, Fort Myers Police Department, David Millhorn and Christopher Reiman's Joint Motion for Summary Judgment as to Reiman's and Millhorn's Probable Cause for the Arrest of Bonita Rosa (Doc. #135) is **GRANTED**.

5.  Defendant David Millhorn's Motion for Qualified Immunity (Doc. #138) is **GRANTED** as to Count II and is **DENIED** to Count I.

6.  Defendants City of Fort Myers, Fort Myers Police Department, David Millhorn and Christopher Reiman's Rule 56 Dispositive Motion for Summary Judgment (Doc. #139) is **GRANTED**.

7.  The Clerk shall withhold the entry of judgment until the conclusion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this __12th__ day of October, 2007.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record